IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **DAVID L. RHODES and** | § | |
| **JANIE RHODES**, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. **3:10-CV-02347-L** |
| | § | |
| **WELLS FARGO BANK, N.A**. | § | |
| **and FEDERAL HOME LOAN** | § | |
| **MORTGAGE CORPORATION,** | § | |
| | § | |
| Defendants. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the court is Defendants Wells Fargo Bank, N.A. and Federal Home Loan Mortgage

Corporation's Motion for Summary Judgment, filed June 15, 2012.  After carefully reviewing the

motion, briefing, appendices, evidence, record, and applicable law, the court **grants** Defendants

Wells Fargo Bank, N.A. and Federal Home Loan Mortgage Corporation's Motion for Summary

Judgment.[1]

**I.      Factual and Procedural Background**

Plaintiffs David L. Rhodes ("Rhodes") and Janie Rhodes (collectively, "Plaintiffs") originally

brought this lawsuit against Defendants Wells Fargo, Bank, N.A. ("Wells Fargo") and  Federal

Home Loan Mortgage Corporation ("Freddie Mac") (collectively, "Defendants") in County Court

at Law No. 4, Dallas County, Texas, on November 2, 2010.  The action was removed by Defendants

---

[1] Defendants' summary judgment motion is granted as to all of Plaintiffs' asserted claims; however, as explained herein, because Plaintiffs concede that they have not asserted a DTPA claim and no such claim exists, Defendants' summary judgment motion as to this claim is denied as moot.

**Memorandum Opinion and Order – Page 1**

to federal court on November 17, 2010. Plaintiffs allege various causes of action against Defendants arising out of Wells Fargo's foreclosure and Freddie Mac's purchase of the property owned by Plaintiffs in Dallas, Texas.[2]  Plaintiffs' claims include those for breach of contract, anticipatory breach of contract, unreasonable collection efforts, fraud, negligent misrepresentation, quiet title and trespass to try title, and violations of the Texas Debt Collection Practices Act ("TDCPA") and the Texas Deceptive Trade Practices Act ("DTPA"). Plaintiffs also seek an accounting, declaratory relief, reinstatement of the Note or the market value of the Property less the amount due on the Note, possession of the Property, actual damages, mental anguish damages, punitive and treble damages, attorney's fees, and costs of suit.

On December 29, 2005, Plaintiffs obtained a fixed rate loan (Loan No. 0200528404) for $151,650 to purchase a house located at 6332 Southpoint Drive in Dallas, Texas ("the Property"). Defs.' App. 6-8. In connection with this purchase, Rhodes executed a Note payable to EverBank in furtherance of the loan and a Deed of Trust to secure the payment of the Note. *See* Defs.' App. 3, ¶ 3; Defs.' App. 6-8 and 108-129; Pls.' App. 1. The Deed of Trust is signed by Rhodes and his wife. Pls.' App. 122, 123, 126. Defendants assert that Wells Fargo began servicing the Plaintiffs' loan on February 28, 2006, through the time of the events that gave rise to this lawsuit. Defs.' App. 3, ¶ 4. Defendants contend that, on October 2, 2009, the Note and Deed of Trust were assigned and transferred to Wells Fargo. Defs.' App. 8 and 131. Plaintiffs dispute the validity of the assignment to Wells Fargo.

---

[2] Defendants contend, based on Plaintiffs' discovery answers, that Plaintiffs' primary residence and homestead is in College Station, Texas. Plaintiffs' discovery answers and summary judgment evidence indicate that Plaintiffs stay at the Property during business trips to Dallas and that five people, including Rhodes, live between both houses. *See* Pls.' App. 42; Defs.' App. 160.

**Memorandum Opinion and Order – Page 2**

Plaintiffs acknowledge that in July 2009, they fell behind on their mortgage loan.  Pls.'

Compl. 3, ¶ 10; Pls.' App. 1.  On August 16, 2009, Wells Fargo notified Rhodes that the loan was

in default with a total delinquency of $4,290.03 as of that date that included a $49.81 late charge.

Defs.' App. 3, ¶ 5; Defs.' App. 10.  The letter further states in pertinent part:

> To avoid the possibility of acceleration, you must pay this amount plus any
> additional monthly payments, late charges and other charges that may be due under
> applicable law after the date of this notice and on or before September 15, 2009 in
> CERTIFIED funds, to Wells Fargo Home Mortgage . . . .
>
> If funds are not received by the above referenced date, we will proceed with
> acceleration.  Once acceleration has occurred, we may take steps to terminate your
> ownership in the property by a foreclosure proceeding or other action to seize the
> home or pursue any other remedy permitted under the terms of your Mortgage.
>
> You have the right to reinstate your Mortgage Note and Mortgage or Deed of
> Trust after acceleration.  However, any future negotiations attempting to reinstate
> your loan or any payment of less than the full amount due shall not require Wells
> Fargo Bank, N.A.'s waiver of the acceleration unless otherwise agreed to, in writing,
> by Wells Fargo, N.A.

Defs.' App. 10.  Rhodes states in an affidavit that he also received a foreclosure notice in October

2009.

From November 23, 2009, through February 19, 2010, Wells Fargo's counsel sent Rhodes

five letters, advising that Wells Fargo was attempting to collect on the debt owed under the Note.

Each of the letters included the total amount of delinquency.  Per Rhodes's request, a reinstatement

quote that included the amount of delinquency, late charges, and attorney's fees was provided on

November 23, 2009.  Defs.' App. 14-15. After Plaintiffs failed to pay, similar collection letters and

reinstatement quotes were sent to Rhodes on December 22, 2009; January 25, 2010; February 10,

2010; and February 19, 2010.  Defs.' App. 16-22.  According to the February 19, 2010 letter and

reinstatement quote, Plaintiffs were nine payments behind on their Note and owed Wells Fargo a total of $22,444.42 in payments, late charges, attorney's fees, and other charges.  Defs.' App. 22.

On February 15, 2010, a letter enclosing a Forbearance Agreement ("FA") was sent to Rhodes at his request. Pls.' App. 18. The letter states: "In order to stop the foreclosure proceedings on your home, please follow the steps outlined below."   Pls.' App. 18.   The letter also directed Rhodes to sign and return the fully executed copies of the agreement, together with a down payment of $8,000, no later than February 19, 2010. *Id.*  On February 19, 2010, Rhodes signed the FA that included a Stipulated Repayment Plan Agreement ("SRP"), and on February 26, 2010, Rhodes made the required down payment of $8,000 to Wells Fargo.  Pls.'App. 18-24.   In addition to the down payment, the FA and SRP required Rhodes to pay an arrearage balance of $14,579.33 in monthly increments of $1,214.94 plus his regular monthly payment of $2,120.11, for a monthly total of $3,335.05, which was due on the first day of each month from April 1, 2010, through March 1, 2011. Pls.' App. 18-22.  The FA expressly states: "The monthly payment plan payments are due according to the attached exhibit 'A'. There is no GRACE PERIOD." Pls.' App. 18-19 (emphasis in original). The SRP further provides:

> 6.  Debtor acknowledges and agrees that the acceleration of the maturity date of the subject Note previously communicated to Debtor remains in full force and effect during the term of this agreement and that Creditor's forbearance of the Trustee's Sale previously announced to Debtor shall not preclude the reinstitution of such sale or any later sale or collection actions upon Debtor's failure to perform the terms of this agreement.

Pls.' App. 21.  Rhodes's performance under the FA and SRP would have made Plaintiffs current on their mortgage payments.

**Memorandum Opinion and Order – Page 4**

Before executing the FA and SRP and making the down payment in February 2010, Rhodes contacted Wells Fargo sometime after July 2009 to request a "loan modification."  Pls.' App. 1. After receiving a foreclosure notice in October 2009, Rhodes contacted Wells Fargo to check on the status of Plaintiffs' "loan modification application" and was told not to worry, that Wells Fargo would not foreclose on the Property "while our loan modification [was] being reviewed." Pls.' App. 2.

Rhodes was notified in November 2009, that Plaintiffs' "request for a loan modification had been denied." *Id.* Rhodes contacted Wells Fargo on December 22, 2009, to inquire about the denial and was informed that Plaintiffs' "loan modification was approved." *Id.* According to Rhodes, a Wells Fargo employee named "Amber" informed him that Plaintiffs would need to make an $8,000 down payment and that their first installment would be due in February 2010. In accordance with Amber's instructions, Rhodes made an $8,000 down payment on December 26, 2009. A "Quick Collect Money Transfers" receipt confirms that two payments of $5,000 and $3,000 were made by Rhodes on December 26, 2009, to Wells Fargo Home Mortgage and the payments were "Acknowledged" on December 28, 2009. Pls.' App. 14-15.

After making the down payment, Rhodes telephoned Wells Fargo again on December 30, 2009, and was told that "a letter regarding our modification had been mailed to me and that I needed to sign and return the agreement." Pls.' App. 2, 8. According to Rhodes, he never received a letter with a loan modification agreement to sign and return but instead received a notice in January 2010, that Plaintiffs' "loan modification had been denied and that our property was reset for foreclosure sale in March 2010" and "Wells Fargo further refused and returned my $8,000 payment." Pls.' App. 2. Rhodes prepared a typed note addressed to Freddie Mac that is dated January 25, 2010, regarding

Plaintiffs' Wells Fargo loan.  In the note, Rhodes explains that Plaintiffs received a letter from Wells

Fargo on January 21, 2010, denying Plaintiffs' earlier requested loan modification. Defs.' App. 105-

06.  Rhodes also requested in the note that Freddie Mac delay the foreclosure date set for February

2, 2010, to give Plaintiffs time to pursue alternative options.  It is not clear whether this note was

ever sent to Defendants although it was submitted by Defendants in support of their summary

judgment motion.

Rhodes subsequently telephoned Wells Fargo to inquire about the denial of Plaintiffs'

requested loan modification and was told that the "loan modification was approved [and] that that

[sic] we needed to pay $8,000 down and that their first installment would be due in April."  Pls.'

App. 2.  It is undisputed that Rhodes paid to Wells Fargo a down payment of $8,000; however, the

summary judgment record establishes that the down payment was made in conjunction with the FA

and SRP, which Rhodes refers loosely to as a "loan modification."[3]  Pls.' App. 18-24.

---

[3] Rhodes refers exclusively to "loan modification" in his affidavit but uses the terms "loan modification," "agreement(s)," and "forbearance agreement" in his response to Defendants' summary judgment motion.  Sometimes the terms are used interchangeably, and other times it appears that Rhodes is taking the position that a "loan modification agreement" and verbal representations allegedly made by Wells Fargo in conjunction with a loan modification agreement are separate and apart from the FA and SRP that he actually executed.  As a result, it is not entirely clear whether Rhodes is confusing these two agreements or referring to a loan modification that was separate and different from the FA and SRP he executed in February 2010.  The court concludes based on the summary judgment record, including the timing of Rhodes's $8,000 payment and subsequent monthly payments of $3,335.05, that his reference to a requested "loan modification" in 2009 and Plaintiffs' performance under a loan modification or other agreement is intended to refer to the FA and SRP even though Plaintiffs contend that they have rights and obligations other than those set forth in the FA and SRP based on alleged verbal representations by Wells Fargo regarding foreclosure.  As noted herein, the record further shows that after Plaintiffs defaulted a second time by failing to pay timely their June 2010 payment in accordance with the FA and SRP, they were told they would need to reapply and submitted requested documentation.  From June 2010 to August 2010, Wells Fargo reviewed Plaintiffs' information to determine whether they qualified for a loan modification under the federal government's Home Affordable Modification Program ("HAMP") or another loan workout option.  There is nothing in the record, however, indicating that Plaintiffs were considered for any loss mitigation options other than the FA and SRP prior to June 2010, and Defendants take issue with Plaintiffs' use of the term "loan modification," contending that the FA and SRP were not loan modification agreements because they did not modify Plaintiffs' obligations under the Note and Deed of Trust.  Plaintiffs' liberal use of the term "loan modification" and "agreement" does confuse matters and has made the court's job in deciphering Plaintiffs' allegations more difficult, but as explained herein, it does ultimately affect the resolution of Defendants' motion.

After receiving this letter, Rhodes states, and Wells Fargo does not appear to dispute, that Plaintiffs timely made their monthly payments under the FA and SRP in April and May 2010. Plaintiffs admit that their June 2010 payment was late; however, Rhodes states that, on an unspecified date in June 2010, he "contacted Wells Fargo to inform them that our June 2010 payment was going to be a few days late due to a family emergency" and was told by Wells Fargo "that [it] would be okay." Pls.' App. 3. Rhodes further states that, on June 4, 2010, he "overnighted" Plaintiffs' June 2010 payment to Wells Fargo. Pls.' App. 3. A FedEx tracking receipt indicates that a shipment was made by Rhodes via FedEx Priority Overnight on June 4, 2010, and delivered to Wells Fargo Home Mortgage on June 7, 2010.

Rhodes telephoned Wells Fargo on June 7, 2010 and he "was told everything was ok and that we were not in foreclosure." Pls.' App. 3, 10. By letter dated June 9, 2010, however, Wells Fargo returned and refused Rhodes' payment of $3,335.05 and notified Plaintiffs that "[y]our loan is in Foreclosure status at this time." Pls.' App. 3, 30. The letter, which was sent by Wells Fargo Home Mortgage Foreclosure Department, explained that "[w]e are returning the funds because they do not represent the total amount due on your account." Pls.' App. 10. The letter further advised that "the return of these funds shall not constitute a waiver of any remedy permitted under the terms of your Mortgage or Deed of Trust." Pls.' App. 10.

Rhodes subsequently "contacted Wells Fargo and was told that I would need to reapply for the loan modification," and "as requested, on June 17, 2010, [he] submitted all the information and documents to Wells Fargo." Pls.' App. 3. Other than Rhodes's affidavit testimony in this regard, there is no record of this telephone conversation or submission of documents. The Wells Fargo log notes ("log notes") submitted by Plaintiff, however, indicate that as of June 21, 2010, Wells Fargo

was aware that "HAMP REVIEW" was needed.  Pls.' App. 45. The log notes further indicate that

Wells Fargo telephoned Plaintiffs and left messages on June 21, 2010 and June 23, 2010, notifying

that additional information, including but not limited to updated value information was needed from

Plaintiffs to complete review of a "WORKOUT," and according to the log, the "UPDATED VALUE

[was] OBTAINED" or provided on June 24, 2010.  Pls.' App. 44-45.

Rhodes received a letter dated June 28, 2010, asking for additional documents and that he

sent the requested documents on June 30, 2010.  Pls.' App. 3.  Wells Fargo's log notes confirm that

Wells Fargo sent Plaintiffs a letter on June 28, 2010, advising that it "WILL REMOVE ON JULY

8TH IF [they] DO NOT FAX NEEDED DOCS."  Pls.' App. 44.  The log notes also state that Wells

Fargo telephoned Plaintiffs on June 29, 2010, and June 30, 2010, and left messages about other

missing information still needed and requested Plaintiffs to contact Wells Fargo.  Pls.' App. 42-43.

In addition, the log notes state that  Rhodes telephoned Wells Fargo and answered all questions but

that 2009 taxes were needed and he was advised to send them on July 1, 2010.  Pls.' App. 42.  In

response to Rhodes's questions concerning foreclosure documents sent to him, Wells Fargo advised

that the Property was in the foreclosure process and any requests to postpone the foreclosure would

need to be made ten days before the scheduled foreclosure.  Pls.' App. 42 ("BRWR1 CALLED

CNRNG FORECLOSURE DOCS SENT TO HIM. ADVISED IN FC PROCESS AND IF HE HAS

TO RQST STOP TO DO IT 10 DAYS BEFORE.").

Rhodes telephoned Wells Fargo on July 1, 2010, and Wells Fargo "confirmed it had

everything it needed for the loan modification."  Pls.' App. 3.  Rhodes states, however, that he

telephoned Wells Fargo again on July 27, 2010, and was told by Wells Fargo representative Bill

Morris ("Morris") that additional documents for the "loan modification" were needed.  Pls.' App.

3.  Rhodes faxed the additional documents to Morris as requested and subsequently learned on August 2, 2010, that Wells Fargo required "updated documents for the loan modification."  Pls.' App. 3.  Rhodes faxed the requested documents to Wells Fargo that same day.  It also appears that Rhodes recycled and amended his earlier January 25, 2010 note to Freddie Mac by crossing out and replacing the January 2010 date with handwritten dates of June 15, 2010, and August 2, 2010, and faxed the note to an unknown recipient on August 2, 2010.  Defs.' App. 105-06.

According to Rhodes, on August 2, 2010, Wells Fargo "told me that it sent their attorney an email requesting that the foreclosure sale be postponed."  Pls.' App. 3, 12.  Wells Fargo's log notes also indicate that when Rhodes telephoned on August 2, 2010, he was advised to contact the local counsel handling the foreclosure.  The following day, the Property was foreclosed on and sold to Freddie Mac.  Rhodes telephoned Wells Fargo's attorney's office, and spoke with someone named Brittany, who told him that no request to postpone the sale was received.  It is unclear from Rhodes's affidavit whether he made this telephone call on August 2, 2010, or August 3, 2010.

Wells Fargo's log notes for August 2, 2010, on the other hand, reflect that it was still missing documents and told Rhodes that before sending in a request to postpone the foreclosure for August 2, 2010, it would need these documents.  Pls.' App. 41 ("SPOKE WITH BRW TOLD HIM WE NEEDED UPDATED F/W AND H/L BEFORE SENDING IN REQUEST TO POST PON F/C FOR TOMORROW.").  The log notes further reflect that when Rhodes telephoned later in the afternoon on August 2, 2010, to check whether the documents had been received by Wells Fargo, he was advised that Wells Fargo would *attempt* to postpone the foreclosure sale date but the Wells Fargo representative made *no guarantees* because the foreclosure and sale of the Property was scheduled for the next day.  Pls.' App. 41 ("BWR CALL TO CHECK IF DOCS WERE RECEIVED ON []

**Memorandum Opinion and Order – Page 9**

8/2/10 DOCS WERE RECEIVED ADV WOULD OPEN GEM TO ATTEMPT TO PP FC SALE

DATE ADV NO GUARANTEES SINCE FC SALE DATE IS TOMORROW.”); *see also* Pls.’ App.

47 (August 3, 2010 log entry stating “E DATE BE P/P, ADVSD THERE IS NO GURANTEES IT

WILL BE P/P.”).  According to the log notes, Rhodes was also advised later that same day that the

request to postpone the foreclosure had been placed by Wells Fargo but “NO RESPONSE” was

received.

Another log entry for August 2, 2010, states that Plaintiffs’ requested workout or HAMP

modification was “DENIED” on August 2, 2010, and sent to “SLR FOR DENIAL REVIEW,

because “BORROWER IS CURRENTLY DUE FOR 12/1/09 AND HAS OVER A $4K DEF[I]CIT.

RAN THRU WP 2 AT CURRENT RATE AND TERM AND ATP ERR.  STRETCHED TERM TO

480 AND LOWERED RATE BY 2% AND ATP STILL ERR.  BORROWER DOES NOT

QUALIFY FOR HAMP SINCE PROPERTY IS N/O/O.  BORROWER DOES NOT QUALIFY

FOR ANY WORKOUT OPTIONS AT THIS TIME.”  Pls.’ App. 41.  It is not entirely clear, but it

appears from the Wells Fargo log that the persons handling Plaintiffs’ HAMP review and workout

options were not the same persons who communicated with Rhodes regarding the pending

foreclosure.

Frustrated, Rhodes faxed to Wells Fargo on August 6, 2010, a “Letter of Rescission”

pertaining to Plaintiffs’ mortgage in which he states that, on August 4, 2010, he spoke with a Wells

Fargo loss mitigation representation, who advised him that Wells Fargo “now owns the home as an

REO” and instructed him to send a “letter and packet of info to save the home.”  Pls.’ App. 31-32.

In the letter, Rhodes states:

**Memorandum Opinion and Order – Page 10**

This process was not supposed to happen.  We were moving forward with a loan mod.  On July 27, 2010[,] I spoke with Wells Fargo rep Bill Morris at ext 4188; he told me all paperwork except updated P&L was in to postpone the Foreclosure date of August 3, 2010.  I faxed that to him on July 29.  I called in on Monday, August 2, 2010 and could not reach Mr. Morris.  Teresa told me that F/C had not been postponed because they needed an updated document.  I told her that I was never informed of this, and why wasn't I??  This was a material fact that had a significant impact on the postponement.  She couldn't answer that question.  I immediately faxed in the updated document that was holding up the email to the law firm that would postpone the sale.  I called later to confirm that it was received, and it was according to your rep.  I was also told that an email had been sent to [the] law firm to postpone the sale.  Apparently, it never was sent as the law firm told me at 10 a[.]m[.] on the 3rd that the sale was moving forward.  We did everything we were told to stop this, and yet it still happened.  We need to correct this mistake and allow us to keep our home.

From your records, you can see that we were on a loan mod earlier this year.  We paid $8,000 in February as a down payment, and then started making monthly payments of $3,335.05.  Our June payment was returned to us and we didn't understand why.  We called and were told that it was one day late.  I told [the] rep that it was late because my mother-in-law was at MD Anderson hospital in Houston for cancer surgery, and that delayed us getting to the Fedex office.  We were told that sorry, no exception for any reason; we had no option but to start all over with the loan mod process.  So, even though that made no sense to us, we did just that.  All documents were sent in as required by Wells Fargo.  To our knowledge, we would get another program going just as we had to save the home.  This was clearly our intent and according to your reps, Wells Fargo's intent as well.

So, I am attaching all documents previously submitted, with my initials and new dates to move forward with us keeping ou[r] home. . . .

Let's work together to solve this problem, as we had been doing.

Pls.' App. 31-32.  According to the affidavit of Wells Fargo operations analyst Michael Dolan, Wells Fargo notified Rhodes in writing on August 16, 2010, that "the documents you provided showed the inability to afford the property; therefore a large deficit disqualifies you for a possible loan modification.  As a result, the request to rescind the foreclosure sale has been denied."  Defs.' App. 3, ¶ 5; 4, ¶ 9.

**Memorandum Opinion and Order – Page 11**

It appears that the parties had no further communications after August 16, 2010, before Plaintiffs brought this action against Defendants on November 2, 2010.  On January 11, 2012, Plaintiffs filed an Amended Complaint ("Complaint").  Defendants both filed amended answers on February 7, 2012, that included counterclaims for declaratory relief pursuant to Rule 57 of the Federal Rules of Civil Procedure, and a request for attorney's fees and costs under section 37.009 of the Texas Civil Practice and Remedies Code applicable to declaratory judgments under Texas law and the Uniform Declaratory Judgment Act.  On June 15, 2012, Defendants moved for summary judgment on all of Plaintiffs' claims.

## II.    Motion for Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); Ragas v. Tennessee Gas *Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary

judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Id.* (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the

existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.  *Celotex*, 477 U.S. at 322-23.

## III.   Analysis

### A.   Breach of Contract

Plaintiffs' claim for breach of contract and anticipatory breach are based on a split-the-note theory.  Specifically, Plaintiffs allege that because Mortgage Electronic Registration Systems, Inc. ("MERS") is not the payee of the Note, never held the Note, and was not authorized to transfer the Note, its assignment of the Deed of Trust to Wells Fargo separate from the Note had no force or effect.  Plaintiffs therefore contend that Wells Fargo had no right to foreclose on the Property, and the sale of the Property to Freddie Mac is void.  Plaintiffs further allege that because Wells Fargo provided Plaintiffs an opportunity to apply for a loan modification and represented that it would not foreclose on the Property during the loan modification process, a unilateral contract was created that was anticapatorily breached by Wells Fargo in foreclosing and selling the Property on August 3, 2010.  Plaintiffs contend that Defendants had a duty of good faith and fair dealing and violated this duty by accelerating Plaintiffs' payments under the Note.  Finally, Plaintiffs contend that Wells Fargo breached the Deed of Trust by failing to give them the right to cure under section 51.002 of the Texas Property Code and  waived any right it may have had to foreclose on the Property by representing that it would not foreclose while Plaintiffs' loan modification was under review.  Pls.' Compl. 6-10, ¶¶ 17-25.

Defendants contend that they are entitled to summary judgment on Plaintiffs' claims for breach of contract and anticipatory breach on the following grounds: (1) Plaintiffs' split-the-note theory is without merit because EverBank's endorsement of the Note to Wells Fargo transferred the

Note and Deed of Trust to Wells Fargo; (2) Plaintiffs lack standing to challenge the assignments; (3) Plaintiffs' contract claims and waiver argument are barred by the statute of frauds Wells Fargo provided Plaintiffs with the opportunity to cure; (4); (5) Texas law does not recognize a duty of good faith and fair dealing in mortgage loans.

Plaintiffs counter that: (1) the assignment from MERS to Wells Fargo is invalid; (2) Plaintiffs have standing to challenge the assignment; (3) Defendants waived their right to foreclose by not providing Plaintiffs with an opportunity to cure before accelerating the loan in June 2010; (4) the statute of frauds is inapplicable; (5) and Defendants breached the unilateral contract.  The parties agree that Plaintiffs' claims are governed by Texas law.

### 1.  Contract Claim Based on Validity of Assignment to Wells Fargo

To state a claim for breach of contract under Texas law, a plaintiff must allege facts from which the court can conclude "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Group*, *LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (internal citation and quotation marks omitted).  To prevail in a breach of contract claim, a plaintiff must allege that the defendant failed to perform an act that it expressly or impliedly promised to perform.  *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc*., 184 S.W.3d 760, 769-70 (Tex. App.  Dallas 2005, pet. denied).  Texas law disfavors implied covenants and generally will not look beyond the parties' written contract to imply a covenant unless it is "necessary to effectuate the parties' intent as disclosed by the contract as a whole, but not to make the contract fair, wise, or just." *Id*. at 770.  "An implied covenant is necessary to effectuate the parties' intentions only if the obligation is 'so clearly within the contemplation of the parties that they deemed it unnecessary to

express it.'" *Id.* (quoting *Nalle v. Taco Bell Corp*., 914 S.W.2d 685, 687 (Tex. App.    Austin 1996, writ denied)).

In construing contracts, the court's primary objective is to ascertain and give effect to the intentions of the parties as expressed in the contract. *See Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). To ascertain the parties' true intentions, the court examines "the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless." *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). "A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation." *Id*. When a contract is worded so that it can be given a definite legal meaning, it is unambiguous, and the court construes it as a matter of law. *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

Plaintiffs' contract claim is based on the validity of the assignment to Wells Fargo. Plaintiffs contend that Texas courts have recently recognized "the validity of the argument that an assignment of an interest under a deed of trust does not carry with it a simultaneous transfer of the note, because MERS, as an electronic registration system only with no actual rights or legal status, never had an interest in the Note." Pls.' Resp. 7. Defendants respond that it is irrelevant whether MERS lacked authority because Wells Fargo provided evidence that the originating lender, EverBank, not MERS endorsed the Note to Wells Fargo, and the Note expressly provides that "The Lender is EverBank . . . I understand that the Lender may transfer this Note." Defs.' Reply 3-4; Defs.' App. 6, 8.

Defendants further assert that Plaintiffs concede in their responsive briefing that a transfer of the Note transfers the Deed of Trust.

As explained in *DeFranceschi v. Wells Fargo Bank, N.A.*, 837 F. Supp. 2d 616 (N.D. Tex. 2011):

> Under Texas law, a deed of trust is a mortgage with a power to sell on default. A mortgage created by a deed of trust is an interest created by a written instrument providing security for payment. The security is established by a note. Because the deed of trust or mortgage has no legal effect apart from the debt or obligation, any transfer of the deed of trust without the note automatically passes the debt.

*Id.* at 622-23. Here, it is undisputed that the Note was executed by Plaintiffs in favor of EverBank, the original lender. As was the case in *DeFranceschi*, the Note provides that its protections to the lender are enforced through the Deed of Trust:

> In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") dated the same date as this Note, protects the Note Holder from possible losses which might result if [Plaintiffs] do not keep the promises which [Plaintiffs] make in this Note. That Security Instrument describes how and under what conditions [Plaintiffs] may be required to make immediate payment in full of all amounts [Plaintiffs] owe under this Note.

Defs.' App. 8. Simultaneously in connection with the Note, a Deed of Trust was executed naming MERS as the "beneficiary under this Security Instrument" and "nominee for the Lender and the Lender's successors and assigns." Defs.' App. 109, 111. With regard to the transfer of rights in the Property, the Deed of Trust likewise provides that MERS is the sole "nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS." Defs.' App. 111. The Deed of Trust further provides:

> This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.

For this purposes, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale [with regard to the Property].

MERS holds only the legal title to the interests granted by Borrower in this Security Instrument, but if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: *to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property*; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

*Id*. (emphasis added).

Defendants' summary judgment evidence demonstrates that EverBank assigned the Note to Wells Fargo, and MERS assigned the Deed of Trust to Wells Fargo on October 2, 2009. Defs.' App. 8, 130. There is also evidence that the servicing rights under the Note and Deed of Trust were transferred to Wells Fargo. Defs.' App. 3, ¶ 4. Accordingly, the assignments of the Note and Deed of Trust are valid, and Wells Fargo was authorized to begin foreclosure of the Property, including appointing a substitute trustee. *See DeFranceschi*, 837 F. Supp. 2d at 623 (concluding that "a transfer of an obligation secured by a note also transfers the note because the deed of trust and note are read together to evaluate their provisions."); Defs.' App. 121, ¶ 24 (power to appoint substitute trustee). Because the deed of trust specifically provided that MERS would have the power of foreclosure and sale, MERS had the power of foreclosure and sale that was passed to Wells Fargo upon MERS's assignment. *Id.* Moreover, the Note gave EverBank the authority to transfer the Note, and EverBank exercised its authority in that regard in transferring the Note to Wells Fargo. Thus, there is no merit to Plaintiffs' argument that the Deed of Trust and Note were separated, rendering any attempted foreclosure by Wells Fargo, or its appointed substitute trustee, defective.

*Id.* Plaintiffs have therefore failed to raise a genuine dispute of material fact regarding the validity of the assignment of the Deed of Trust, and Wells Fargo is entitled to judgment as a matter of law.[4]

### 2.    Oral Unilateral Contract Theory and Anticipatory Breach

In Texas, "[a] unilateral contract . . . is 'created by the promisor promising a benefit if the promisee performs'" and becomes enforceable once the promisee performs. *Vanegas v. American Energy Servs.*, 302 S.W.3d 299, 302 (Tex. 2009) (quoting *Plano Surgery Ctr. v. New You Weight Mgmt. Ctr.*, 265 S.W.3d 496, 503 (Tex. App.   Dallas 2008, no pet.)). To state a claim for anticipatory breach, a plaintiff must allege: "(1) an absolute repudiation of the obligation; (2) a lack of a just excuse for the repudiation; and (3) damage to the non-repudiating party." *Gonzalez v. Denning*, 394 F.3d 388, 394 (5th Cir. 2004).   "[W]hen one party to an agreement has repudiated it, the other party may then accept the agreement as being terminated or consider the repudiation as a breach of contract and bring suit for damages." *Id.* (quoting *Hauglum v. Durst*, 769 S.W.2d 646, 651 (Tex. App.   Corpus Christi 1989, no writ)).   A defendant's duty to pay damages, however, is "discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise." *Gonzalez*, 394 F.3d at 394-95 (quoting Restatement (Second) of Contracts § 254 (1981)).

Plaintiffs allege that "Wells Fargo offered to allow Plaintiffs an opportunity to apply for a loan modification, instructed Plaintiffs not to make payments, and stated that it would not foreclose during this process," and that "Plaintiffs' reliance on [Wells Fargo's] promises, to their detriment,

---

[4] Because Plaintiffs contract claim based on the validity of the assignment fails as a matter of law, the court does not address in detail Defendants' alternative argument that Plaintiffs lack standing to contest the assignment except to note that Defendants are entitled to judgment as a matter of law on this ground as well. *See Metcalf v. Deutsche Bank Nat'l Trust Co.*, No. 3:11-CV-3014-D, 2012 WL 2399369, at *5 (N.D. Tex. June 26, 2012).

constituted a unilateral contract which was breached by the Defendant when it foreclosed on August 3, 2010." Pls.' Compl. 7-8. Plaintiffs similarly contend in response to Defendants' summary judgment motion that Wells Fargo's conduct in providing Plaintiffs with an opportunity to apply for a loan modification and making statements that it would not foreclose on the Property during the loan modification process gave rise to a unilateral contract. More specifically, Plaintiffs assert that their:

> actions in applying for a loan modification, Defendants' subsequent assurances that Plaintiffs were in the modification process, Wells Fargo['s statement that it] does not accept payments during the loan modification process, [Wells Fargo's statement that it] does not foreclose during the loan modification review process, and [Wells Fargo's request for] Plaintiffs to make an $8,000 down payment, show that Plaintiffs' actions were "unequivocally referable" to the alleged oral agreement and corroborate the existence of that agreement.

Pls.' Resp. 20-21 (citing Pls.' App. 2, 3, 14-17). Plaintiffs contend that they accepted Wells Fargo's offer to modify their loan by providing Wells Fargo all information requested and making an $8,000 down payment. Plaintiffs argue that the unilateral contract was anticapatorily breached by Defendants when they foreclosed on the Property on August 3, 2010. Pls.' Resp. 22-23.

Defendants counter that there was no unilateral contract because the information requested and Plaintiffs' down payment were not made pursuant to an oral loan modification agreement but were instead provided pursuant to the written SRP, which permitted Wells Fargo to accelerate and foreclose. Defendants assert that the SRP expressly provided that the "acceleration of the maturity date of the subject Note remains in full force and effect" and "forbearance of the Trustee's Sale . . . shall not preclude the reinstitution of such sale or any later sale or collection action upon [David L. Rhodes's] failure to perform the terms of this agreement." Defs.' Resp. 12; Defs.' App. 26. Defendants also contend that the conclusory statements in Rhodes's affidavit that a late payment in

contravention of the SRP would be accepted by Wells Fargo do not constitute competent summary judgment evidence.

Plaintiffs confuse the loan modification process with the SRP and FA that was intended to cure Plaintiffs' first default in 2009 by requiring them to make an initial payment of $8,000 in February 2010, and subsequent monthly payments of $3,335.05 from April 4, 2010, through March 1, 2011.  More importantly, Plaintiffs conflate the events surrounding their first and second default. Specifically, Plaintiffs argue that in foreclosing on the Property after Plaintiffs' second default in June 2010, Wells Fargo anticapatorily breached an oral agreement not to foreclose during the loan modification process that was created after Plaintiffs defaulted the first time in 2009.      E v e n assuming that Wells Fargo agreed not to foreclose while Plaintiffs were in the loan modification process after their first default and told them not to make payments while their application was being considered, that process ended in February 2010 when Rhodes executed the FA and SRP, made an $8,000 down payment, and began making monthly payments of $3,335.05 pursuant to those agreements.  It is undisputed that Wells Fargo did not foreclose after Plaintiffs defaulted the first time because Rhodes agreed to be bound by the FA and SRP and to make the necessary payments under those agreements.  Further, there is no evidence, and Plaintiffs do not contend, that Wells Fargo's promise not to foreclose on the Property during what Plaintiffs refer to as the "loan mod"[5] or "loan modification" process that occurred in late 2009 and early 2010, was intended to continue on in perpetuity after the FA and SRP were executed.

---

[5]  Rhodes states in an August 5, 2010 letter to Wells Fargo: "From your records, you can see that we were on a loan mod earlier this year: We paid $8,000 in February as a down payment, and then started making monthly payments of $3,335.05."  Pls.' App. 31.  As noted previously, however, the record demonstrates that these payments were made pursuant to the FA and SRP executed by Rhodes in February 2010.

**Memorandum Opinion and Order – Page 21**

To connect the events that occurred with regard to their first and second default, Plaintiffs want this court to assume or make an impermissible inference that the promise by Wells Fargo not to foreclose, which was made before execution of the FA and SRP in February 2010, survived their second default in June 2010. Such an assumption or inference, however, is not supported by the record or Plaintiffs' own summary judgment evidence. Although correspondence from Wells Fargo's counsel states that Plaintiffs must provide requested information and a down payment of $8,000 in order to stop foreclosure proceedings, the attached SRP and FA provide that: "The plan payments are due on the date indicated above. There is no GRACE PERIOD" and:

> 6. Debtor acknowledges and agrees that the acceleration of the maturity date of the subject Note previously communicated to Debtor remains in full force and effect during the term of this agreement **and that Creditor's forbearance of the Trustee's Sale previously announced to Debtor shall not preclude the reinstitution of such sale or any later sale or collection actions upon Debtor's failure to perform the terms of this agreement.**

Pls.' App. 21 (emphasis added to ¶ 6); *see also* Pls.' App. 18, ¶ 3 ("The monthly plan payments are due according to the attached Schedule 'A.' **There is no grace period**.") (emphasis in original). Thus, while Wells Fargo agreed to postpone the foreclosure proceedings that were initially commenced after Plaintiffs' first default in 2009, it made clear via the FA and SRP to which Plaintiffs agreed, that acceleration and foreclosure proceedings would be reinstated if Plaintiffs failed to make payments timely in accordance with the schedule provided.

Moreover, Plaintiffs also do not appear to contend that an oral agreement came into existence after they defaulted a second time as a result of any representations by Wells Fargo not to foreclose. As previously noted, all of the evidence that Plaintiffs rely on in arguing that an oral agreement was created relate to events that occurred after they defaulted the first time and before they entered the FA and SRP in February 2010. In any event, the record is devoid of any evidence that Wells Fargo

**Memorandum Opinion and Order – Page 22**

similarly promised Plaintiffs that it would not foreclose after they defaulted the second time in June 2010 while they were being considered again for various workout options, which Rhodes refers to as a loan modification.  Rhodes states in his affidavit that he contacted Wells Fargo in June 2010, to advise that Plaintiffs' June 2010 payment would be late and was told by Wells Fargo "that [it] would be okay."  Pls.' App. 3.  He further states that he telephoned Wells Fargo on June 7, 2010, and he "was told everything was ok and that we were not in foreclosure."  Pls.' App. 3, 10.   These statements by Wells Fargo are not evidence that Wells Fargo promised not to commence acceleration or foreclosure proceedings as a result of Plaintiffs' late payment and second default. At most, it merely shows that Plaintiffs were not in foreclosure *as of June 7, 2010.*  Likewise, Plaintiffs' evidence that Wells Fargo agreed to consider and process their second request for a loan modification is not evidence that Wells Fargo agreed to postpone foreclosure proceedings, especially in light of Wells Fargo's June 9, 2010 letter advising Plaintiffs that their "loan is in Foreclosure status at this time."  Pls.' App. 30.  Rhodes's testimony is also inconsistent with his August 5, 2010 letter in which he states that "Our June Payment was returned to us . . . *We called and were told it was one day late. . . . We were told that sorry, no exception for any reason*; we had no option but to start all over with the loan mod process."  Pls.' App. 31 (emphasis added).

Rhodes also states in his affidavit that he was told that Wells Fargo's attorney had sent an e-mail "requesting" postponement of the foreclosure and Wells Fargo foreclosed on the Property on August 3, 2012, "despite its promise that it would postpone the foreclosure." Pls.' App. 3.  A statement that a *request* to postpone the impending foreclosure had been made, however, is not evidence that Wells Fargo promised not to foreclose or postpone the foreclosure.  Moreover,

**Memorandum Opinion and Order – Page 23**

Rhodes's statements in this regard are directly contradicted by Plaintiffs' other summary judgment evidence.

According to Rhodes's handwritten notes, the foreclosure had not been postponed as of August 2, 2012.  Pls.' App. 12 (8/2- F/Cl <u>not</u> postponed. they need <u>another</u> update.") (emphasis in original).  In addition, Wells Fargo's call notes show that Rhodes was told on August 2, 2012, that Wells Fargo would "attempt" to postpone the foreclosure scheduled for August 3, 2012, but could "NO[T] GUARANTEE" that it would be postponed.  Pls.' App. 41.  Thus, while Wells Fargo may have agreed to postpone the foreclosure proceedings that were initially commenced after Plaintiffs defaulted the first time in 2009, it made clear via the FA and SRP to which Plaintiffs agreed, that acceleration and foreclosure proceedings would be reinstated in the event Plaintiffs failed to perform under the FA and SRP, which required that payments be made in accordance with the schedule provided.  Pls.' App. 18, ¶ 3 ("The monthly plan payments are due according to the attached Schedule 'A.' **There is no grace period**.") (emphasis in original).

Finally, although not asserted by Defendants, the court concludes that Rhodes's affidavit testimony as to what Wells Fargo told him is inadmissible hearsay.  The testimony consists of out of court statements offered as evidence of the truth of the matter asserted, *see* Fed. R. Evid. 801(c)(2), and the court finds no basis for admitting the evidence under the Federal Rule of Evidence 801(d)(2), or any recognized exception to the hearsay rule.  Consequently, the court does not consider it in ruling on Defendants' summary judgment motion.  Fed. R. Civ. Proc. 56.  For this and the other reasons stated, the court concludes that Plaintiffs have failed to create a genuine dispute of material facts as to the existence of an oral unilateral contract and whether Wells Fargo's

anticapatorily breached such agreement by foreclosing on the Property in August 2010, after Plaintiffs breached the FA and SRP and defaulted the second time.  Accordingly, Defendants are entitled to judgment as a matter of law as to Plaintiffs' unilateral contract and anticipatory breach claim.

### 3.    Statute of Frauds Defense and Equitable Exceptions

Defendants alternatively contend that Plaintiffs' oral unilateral contract claim is barred by the statute of frauds.  Defendants assert that because Plaintiffs' original Note and Deed of Trust are subject to the statute of frauds, any alleged oral agreement to modify Plaintiffs' original Note and Deed of Trust and not initiate foreclosure proceedings during the loan modification process is also subject to the statute of frauds. Defendants further contend that because the alleged oral agreement was never reduced to writing or signed by Wells Fargo, it is not enforceable under section 26.02 of the Texas Business and Commerce Code.

Plaintiffs appear to acknowledge the applicability of the statute of frauds by asserting in their responsive brief that section 26.02 of the Texas Business and Commerce Code generally applies to loans exceeding $50,000 and acknowledging that such loan agreements are generally not enforceable unless they are in writing and signed by the party to be bound.  Pls.' Resp. 19.  Instead of arguing that the statute of frauds does not apply, Plaintiffs contend that the equitable exceptions of partial performance and promissory estoppel save their oral contract claim from the statute of frauds.

With regard to these exceptions, Plaintiffs argue that "Defendants should have expected that the promise/representations of reviewing and approving a modification and not foreclosing on Plaintiffs' property would lead to a definite and substantial injury in that Plaintiffs would eventually lose their property, even though Defendants were representing to Plaintiffs that they would not."

Pls.' Resp. 21.  Plaintiffs further assert that they were told that "a letter regarding the modification

had been mailed to Plaintiffs and that they need to sign it and return it to Wells Fargo." *Id.*  Plaintiffs

therefore contend that "[n]ot only was [this] agreement a promise to sign an existing document that

satisfies the state of frauds, but the performance by Plaintiffs [in providing requested information

and a down payment] provides the consideration to take the agreement out of the statute of frauds."

*Id.*

The statute of frauds requires that certain specified classes of contracts be in writing to be

enforceable.  Tex. Bus. & Com. Code § 26.01.  Section 26.02 of the Texas Business and Commerce

Code states, "A loan agreement in which the amount involved in the loan agreement exceeds

$50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be

bound or by that party's authorized representative."  Tex. Bus. & Com. Code § 26.02(b).  Section

26.02 defines loan agreement as:

> one or more promises, promissory notes, agreements, undertakings, security
> agreements, deeds of trust or other documents, or commitments, or any combination
> of those actions or documents, pursuant to which a financial institution loans or
> *delays repayment of or agrees to loan or delay repayment of money*, goods, or
> another thing of value or to otherwise extend credit or make a financial
> accommodation.

§ 26.02(a)(2) (emphasis added).  Section 26.02 further provides:

> (c) The rights and obligations of the parties to an agreement subject to
> Subsection (b) of this section *shall be determined solely from the written loan
> agreement, and any prior oral agreements between the parties are superseded by and
> merged into the loan agreement.*

> (d) An agreement subject to Subsection (b) of this section *may not be varied
> by any oral agreements or discussions that occur before or contemporaneously with
> the execution of the agreement.*

§ 26.02(c)-(d) (emphasis added).

**Memorandum Opinion and Order – Page 26**

In Texas, oral modifications of a written contract subject to the statute of frauds are also subject to the statute of frauds if they materially alter the obligations imposed by the original contract *Horner v. Bourland*, 724 F.2d 1142, 1148 (5th Cir. 1984). "An oral agreement to modify the percentage of interest to be paid, the amounts of installments, security rights, the terms of the remaining balance of the loan, the amount of monthly payments, the date of the first payment, and the amount to be paid monthly for taxes and insurance is an impermissible oral modification." *Id.* (citing *Foster v. Mutual Savings Ass'n*, 602 S.W.2d 98 (Tex. Civ. App.   Fort Worth 1980, no writ)). Thus, when "the plaintiffs allege that they applied for a specific program altering their obligations under the original loan and came to an oral agreement with the bank regarding this program, this is a material alteration of the underlying contract and thus subject to the statute of frauds." *Montalvo v. Bank of America Corp.*, ___ F. Supp. 2d ___, No. SA-10-CV-360-XR, 2012 WL 1078093, at *13 (W.D. Tex. Mar. 30, 2012) (citing *Deuley v. Chase Home Fin., LLC*, Civ. A. No. H  05  04253, 2006 WL 1155230, at *3 (S.D. Tex. Apr. 26, 2006)).  Agreements to modify an existing loan agreement include agreements to "delay repayment of money" and "forego or delay foreclosure" and are subject to the statute of frauds.  *Id.* at *3; *Krudop v. Bridge City State Bank*, No. 09-05-111, 2006 WL 3627078, at *4 (Tex. App.   Beaumont Dec. 14, 2006, pet. denied) ("[A]ny agreement to forego or delay foreclosure . . . would fall under the provisions of section 26.02(b), and be included under the definition of a loan agreement in section 26.02(a)(2).").

Because Plaintiffs' original Note was for $151,650, it is subject to the statute of frauds. Moreover, the court determines that any alleged agreement to modify Plaintiffs' loan, as well as the alleged agreement to forgo foreclosure proceedings during the loan modification review process is directly contrary to and materially alters Wells Fargo's right under the original Note and Deed of

Trust, and the FA and SRP to accelerate the maturity date of the Note, foreclose on the Property, and enforce the previously obtained order authorizing foreclosure until the terms of the SRP are fully satisfied.  Pls.' App. 21, ¶¶ 5-10; *see Montalvo*, 2012 WL 1078093, at *13; *Deuley*, 2006 WL 1155230, at *3; *Krudop*, 2006 WL 3627078, at *4.  Thus, the alleged oral agreement is also subject to the statute of frauds and must be in writing to be enforceable since it materially alters the parties' obligations under the original loan agreement.  Because the modification was oral and never reduced to writing, it is unenforceable.  *See Ford v. City State Bank of Palacios*, 44 S.W.2d 121, 137-38 (Tex. App.   Corpus Christi 2001, no pet.).  Further, to the extent Plaintiffs contend that a new oral agreement was created rather than a modification of the original loan, the statute of frauds would still apply.  *See Deuley*, 2006 WL 1155230, at *3.  Thus, even assuming that there was an oral unilateral contract, Plaintiffs' claim based on an oral unilateral contract is barred by the statute of frauds, and Defendants are entitled to judgment on this claim unless one of the equitable exceptions urged by Plaintiffs applies.

### a.      Partial Performance

Plaintiffs argue that the statute of frauds does not apply to their contract claim because they partially performed under the alleged oral agreement.  Under the partial performance exception urged by Plaintiffs, "contracts that have been partly performed, but do not meet the requirements of the Statute of Frauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud." *Carmack v. Beltway Dev. Co.*, 701 S.W.2d 37, 40 (Tex. App.   Dallas 1985, no writ). Virtual fraud refers to fraud that arises "when there is strong evidence establishing the existence of an agreement and its terms, the party acting in reliance on the contract has suffered a substantial detriment for which he has no adequate remedy, and the other party, if permitted to plead the statute,

would reap an unearned benefit." *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App.   Dallas 2002, pet. denied).   The alleged partial performance "must be unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." *Id.*  Additionally, the partial performance "relied upon to take a parol contract out of the statute of frauds must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced; otherwise, they do not tend to prove the existence of the parol agreement relied upon by the plaintiff." *Id.* at 439-40.

Plaintiffs allege that Wells Fargo told them "not to worry[,] that it would not foreclose on a property while their loan modification [was] being reviewed." Pls.' Compl. 3, ¶ 11; Pls.' App. 2. According to Rhodes's affidavit, however, this alleged representation occurred after Plaintiffs' first default, and it is undisputed that Wells Fargo did not foreclose at this time and instead worked with Plaintiffs to get them on an alternative payment plan under the FA and SRP.  Despite being given this opportunity, Plaintiffs defaulted yet again two months into the repayment plan.  Plaintiffs also claim that Wells Fargo again promised not to foreclose after they defaulted a second time by  failing to make timely their June 2010 payment under the FA and SRP; however, Plaintiffs acknowledge and the parties' evidence demonstrates that Plaintiffs' alleged partial performance in providing information and making a down payment of $8,000 and monthly payments was done in conjunction with their first requested loan modification that resulted in the FA and SRP, long before Wells Fargo's alleged representations from June 2010 to August 2010, that gave rise to the alleged agreement. Thus, Plaintiffs' performance that occurred *before* Wells Fargo made the alleged promises not to foreclose cannot be construed as "unequivocally referable" to the alleged promises that occurred during the second loan modification application process *after* Plaintiffs defaulted a

second time in June 2010.  Thus, Plaintiffs' partial performance does not meet the requirement that it "must be such as could have been done *with no other design than to fulfill the particular agreement sought to be enforced*."  *Exxon Corp.*, 82 S.W.3d at 439-40 (emphasis added).

Moreover, Plaintiffs admit that they were required, but failed to make timely their June 1, 2010 payment under the SRP and FA.  As a result, Wells Fargo was entitled to foreclose under the SRP and FA and the original Note and Deed of Trust, and any partial performance by Plaintiffs before June 2010 is irrelevant.   Additionally, as correctly noted by Defendants, Plaintiffs' performance in making payments is insufficient to create a new contract or modification of an existing contract because Plaintiffs were already obligated to make payments under the Note, SRP, and FA.  For support, Defendants cite *Arthur J. Gallagher v. Dieterich*, 270 S.W.3d 695, 702 (Tex. App.   Dallas 2008, no pet.), for the proposition that "[w]hen a party agrees to do no more than that which he is already bound to do under an existing contract, the consideration is not sufficient to support a modification. [T]o be effective, modification must be supported by additional consideration." *Id.* (citation omitted); *Martens v. Prairie Producing Co.*, 668 S.W.2d 889, 891 (Tex. App.   Houston [14th Dist.] 1984, no pet.).  Accordingly, Plaintiffs' oral unilateral contract claim based on Defendants' alleged oral promise not to foreclose during the loan modification process and Plaintiffs' evidence of partial performances do not bar the application of the statute of frauds to Plaintiffs' oral unilateral contract claim.

### b.      Promissory Estoppel

Plaintiffs' promissory estoppel argument likewise fails.  Promissory estoppel is normally asserted as a defense but is also available as a cause of action to a promisee who has reasonably relied to his detriment on an otherwise unenforceable promise.  *See Gold Kist, Inc. v. Carr*, 886

S.W.2d 425, 431 (Tex. App.    Eastland 1994, pet. denied); *Kelly v. Rio Grande Computerland Grp.*,

128 S.W.3d 759, 769 (Tex. App.    El Paso 2004, no pet.).  The equitable doctrine of promissory

estoppel bars the application of the statute of frauds and permits a court to enforce an otherwise

unenforceable oral agreement when: "(1) the promisor makes a promise that he should have expected

would lead the promisee to some definite and substantial injury; (2) such an injury occurred; and (3)

the court must enforce the promise to avoid the injury." *Exxon Corp.*, 82 S.W.3d at 438 (citing *Nagle

v. Nagle*, 633 S.W.2d 796, 800 (Tex. 1982), and *"Moore" Burger, Inc. v. Phillips Petrol. Co.*, 492

S.W.2d 934, 936 (Tex. 1972)).  To fall within this exception when there is an oral promise to sign

an agreement, "the agreement that is the subject of the promise must comply with the statute of

frauds," that is, "the agreement must be in writing *at the time the promise is made*." *Id.* (citations

omitted and emphasis added).  Thus, there must have been a promise to sign a written agreement that

had been prepared and that would satisfy the requirements of the statute of frauds.  *Nagle*, 633

S.W.2d at 800.  It is the promise to sign a written agreement or enter into a written agreement that

is determinative.  *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 769 (5th Cir. 1988).

Promissory estoppel sufficient to remove a contract from the statute of frauds requires that the

promisor agree to sign a document that had already been prepared or "whose wording had been

agreed upon" that would satisfy the statute of frauds.  *Id.* at 766.  A mere promise to prepare a

written contract is not sufficient. *Beta Drilling, Inc. v. Durkee*, 821 S.W.2d 739, 741 (Tex.

App.    Houston [14th Dist.] 1992, writ denied).

        Plaintiffs contend that Defendants assured them that they were in the modification process

and a letter regarding the modification was being mailed to them for their signature.  Pls.' App. 2.

Defendants counter that Plaintiffs "fail to provide or even describe the existing document that

satisfies the statute of frauds, much less, demonstrate that Wells Fargo agreed to sign that agreement." Defs.' Reply 9.[6] The court agrees. As previously explained, it is irrelevant whether Wells Fargo promised not to foreclose during what Plaintiffs refer to as their first requested loan modification application process because Wells Fargo did not foreclose and instead offered Plaintiffs the opportunity to bring their mortgage payments up-to-date under the FA and SRP. Plaintiffs admit that no modification agreement was provided to them for their signature other than the FA and SRP, under which they defaulted. More importantly, Plaintiffs fail to allege or provide any evidence that a loan modification agreement was ever prepared and signed by Wells Fargo that included the alleged promise not to foreclose on the Property while Plaintiffs were undergoing the second loan modification application process. *See Exxon Corp.*, 82 S.W.3d at 438-39. Rather, all evidence of Plaintiffs' written communications with Wells Fargo, including Plaintiffs' evidence of Wells Fargo's log notes, establishes the contrary. Accordingly, Plaintiffs' oral unilateral contract claim based on Defendants' alleged oral promise not to foreclose during the loan modification process and Plaintiffs' contentions regarding promissory estoppel do not bar the application of the statute of frauds to Plaintiffs' oral unilateral contract claim.

---

[6] To support their contention that promissory estoppel applies only to avoid the statute of frauds when the alleged oral promise is to sign an existing document that satisfied the state of frauds, Defendants cite the following cases: *McDonald v. Deutsche Bank Nat'l Trust Co.*, No. 3:11-CV-2691-B, 2012 WL 2122168, at *5 (N.D. Tex. June 11, 2012) ("Though McDonald has alleged that a number of customer representatives assured her that it would not foreclose her property while her loan modification was under review, she has not alleged that Defendants promised to execute a written document incorporating the alleged agreement. Accordingly, McDonald has failed to state a plausible claim for relief under the doctrine of promissory estoppel."); *Obuekwe v. Bank of Am., N.A.*, No. 4:11-CV-762-Y, 2012 WL 1388017, at *5 n.4 (N.D. Tex. Apr. 19, 2012) ("[P]romissory estoppel does not save [plaintiff's] alleged oral contract because [plaintiff] has not alleged that Defendants promised to reduce the oral unilateral contract to writing."); *Hurd v. BAC Home Loans Serv., LP*, No. 3:11-CV-1752-M, F. Supp. 2d , 2012 WL 1106932, at *10-11 (N.D. Tex. Mar. 29, 2012) (finding that representative's statements that plaintiff "prequalified for one of the three modifications" and "that a package would be sent in the mail within thirty days confirming the new modification" were not sufficient to establish promissory estoppel because "Defendant only told Plaintiff that she would be given or was eligible for a loan modification and never promised to sign an existing written agreement."). Defs.' Reply 9.

**Memorandum Opinion and Order – Page 32**

### 4.      Contract Claim Based on Opportunity to Cure

Plaintiffs contend that Defendants breached the Deed of Trust by failing to give them the opportunity to cure under section 51.002(d) of the Texas Property Code and the Deed of Trust by demanding past due installments before exercising the option to accelerate. *See* Pls.' Compl. 9, ¶ 24. Plaintiffs also take issue with Defendants' assertion that Wells Fargo gave Plaintiffs several opportunities to cure. Plaintiffs contend that, because they had applied for a loan modification, entered into a FA and made payments in accordance with that agreement, any notices that Defendants sent prior to the FA were nullified and Defendants were required again to give them another opportunity to cure before accelerating the loan in June 2010 after they failed to make timely the June 1, 2010 payment under the FA. Plaintiffs further assert that since they "were told that it was ok to send their payment in late, Plaintiffs did not breach the agreement." Pls.' Resp. 14-15. Plaintiffs argue that Defendants' June 9, 2010 letter stated that Wells Fargo was refusing Plaintiffs' June 2010 payment of $3,335.05 because it was not the correct amount, but it did not state the amount due on the account necessary to cure. For this reason and because they were allegedly told they could submit the payment late, Plaintiffs argue they were not given an opportunity to cure and Defendants had no right to foreclose.

Section 51.002 of the Texas Property Code sets forth the requirements for conducting a sale of real property under a contract lien. Section 51.002 requires mortgage servicers to provide the debtor with notice of default and opportunity to cure, 20 days in advance of providing any notice of sale. Tex. Prop. Code § 51.002(d).[7]

---

[7] Section 51.002(d) states in full:

(d) Notwithstanding any agreement to the contrary, the mortgage servicer of the debt shall

The evidence shows that Plaintiffs defaulted twice.  After the first default, Plaintiffs were given the opportunity to cure via the SRP and FA.  Less than four months after Plaintiffs signed the SRP and FA, they defaulted again by failing to timely make the June 1, 2010 payment as required by the SRP, which expressly states that there would be "no GRACE PERIOD."  Pls.' App. 19 (emphasis in original).  Wells Fargo notified Plaintiffs of the latter default on June 9, 2010.  Defs.' App. 30.  Twenty days later, on June 29, 2010, Wells Fargo provided Plaintiffs with a "Notice of Substitute Trustee Sale" that was scheduled for August 3, 2010.[8]  Defs.' App. 36, and 38-103.  Pursuant to the notice, the Property was sold on August 3, 2010, and purchased by Freddie Mac for the amount of $157,687.79.  Defs.' App. 136.  Thus, the court determines that the notices provided to Plaintiffs satisfied section 51.002(d)'s twenty day notice requirement.

With regard to Plaintiffs' argument that Wells Fargo's June 2010 notice was defective because it did not state the amount needed to cure the default, section 51.002 contains no such requirement, and Plaintiffs have not pointed the court to any authority that Texas courts have construed section 51.002 to include such a requirement.  Further, although the Deed of Trust requires that the notice of acceleration include "the action required to cure the default," the SRP signed by Plaintiffs in February 2010, states:

---

serve a debtor in default under a deed of trust or other contract lien on real property used as the debtor's residence with written notice by certified mail stating that the debtor is in default under the deed of trust or other contract lien and giving the debtor at least 20 days to cure the default before notice of sale can be given under Subsection (b). The entire calendar day on which the notice required by this subsection is given, regardless of the time of day at which the notice is given, is included in computing the 20-day notice period required by this subsection, and the entire calendar day on which notice of sale is given under Subsection (b) is excluded in computing the 20-day notice period.

*Id.*

[8] Wells Fargo also provided Plaintiffs with notice of the sale on June 25, 2010, before the time permitted by section 51.002(d).  Wells Fargo's June 29, 2010 notice of sale, however, was provided in accordance with section 51.002(d) in that it was sent 20 days after Plaintiffs were given notice of the default.  *See* § 51.002(d).

**Memorandum Opinion and Order – Page 34**

> [I]n the event Debtor fails to strictly perform the terms of this agreement, Creditor will terminate this agreement in its entirety . . . and immediately proceed with the pursuit of its rights and remedies afforded by the Deed of Trust . . . without further demand or notice to Debtor, other than the notice of the time and place of the Trustee's Sale.

Defs.' App. 120; Pls.' App. 21, ¶ 5.  The court therefore concludes that the SRP modified the notice requirement under the Deed of Trust such that Wells Fargo was no longer required to provide Plaintiffs with notice of the specific action required to cure the default.  Moreover, there is no evidence that Plaintiffs requested or Wells Fargo refused to provide Plaintiffs with information regarding the amount of the balance due under their Note necessary to cure the default.  Accordingly, the court determines that Defendants have submitted proof that Plaintiffs were provided the notice legally required by section 51.002 of the Texas Property Code and the SRP, and Plaintiffs have failed to raise a genuine dispute of material fact regarding Defendants' alleged breach of the Deed of Trust based on Plaintiffs' opportunity to cure.

### 5.    Alleged Waiver of Right to Foreclose

"Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right."  *Sun Explor. & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987).  To establish waiver, the plaintiff must show: "(1) an existing right, benefit, or advantage; (2) knowledge, actual or constructive, of its existence; and (3) an actual intent to relinquish the right (which can be inferred from conduct)."  *G.H. Bass & Co. v. Dalsan Props.-Abilene*, 885 S.W.2d 572, 577 (Tex. App.   Dallas 1994, no writ) (internal citations omitted). When waiver is based on inference, "it is the burden of the party who is to benefit by a showing of waiver to produce conclusive evidence that the opposite party unequivoca[l]ly manifested" its intent to no longer assert its claim."  *Id.* (alteration in original) (citation and quotation marks omitted).

Plaintiffs contend that Wells Fargo waived its right to accelerate and foreclose by acting inconsistently with the "no waiver" provisions of the Note, Deed of Trust, and FA because:

- Wells Fargo told Plaintiffs not to make payments while they were in the loan modification process[] because Wells Fargo would reject it.

- Wells Fargo told Plaintiffs that it would not foreclose on their property while they were in the loan modification process.

- Plaintiffs received notice that they had been denied for the loan modification, however, when Plaintiffs contacted Wells Fargo about the denial, Wells Fargo told Plaintiffs they had been approved for the loan modification.

- Wells Fargo told Plaintiffs that [they] had to pay $8,000 down payment and that their first installment would be due in February 2010. As instructed, on December 26, 2009, Plaintiffs paid Wells Fargo $8,000 via western union. Wells Fargo rejected Plaintiffs' $8,000 payment.

- Plaintiffs were told that a letter regarding the loan modification had been mailed to Plaintiffs and that they needed to [sign] it and return it to Wells Fargo.

- Plaintiffs again received notice that they were denied for the loan modification, but again, when Plaintiffs contacted Wells Fargo[,] they were told they were approved and that they needed to pay $8,000 as down and that their first installment would be due in April.

- Plaintiffs again paid Wells Fargo $8,000 as down payment on February 26, 2010. Plaintiff[s] then began paying their monthly installment pursuant to the agreement. Wells Fargo accepted these payments.

- Wells Fargo told Plaintiffs that it would be ok if Plaintiffs' June 2010 payment was a few days late because Plaintiffs had a family emergency. But Wells Fargo then returned Plaintiffs' June 2010 payment since it was not for the total amount [of the balance due under the Note].

- Plaintiffs were told [that they would need to] reapply for a loan modification, which they did.

- Plaintiffs provided additional documents to Wells Fargo on June 30, 2010, July 29, 2010[,] and again on August 2, 2010.

**Memorandum Opinion and Order – Page 36**

- Even though Plaintiffs were still in the loan modification process, Wells Fargo foreclosed upon Plaintiffs' property on August 3, 2010.

Pls.' Resp. 17-18.  Plaintiffs further contend that Wells Fargo waived its right to accelerate and foreclose on the Property because Wells Fargo did not act diligently in foreclosing and represented to Plaintiffs that the "loan modification was a foregone conclusion and not to make any payments during the loan modification process." *Id.* 18.  Plaintiffs contend that Wells Fargo waived its right to foreclose based on Wells Fargo's alleged failure to permit them to cure and reinstate the Note after Plaintiffs defaulted under the FA, and in representing that it would not foreclose while Plaintiffs were in the modification process.

Defendants counter that the same waiver argument by Plaintiffs' counsel was asserted and rejected by the court in *Richardson v. Wells Fargo Bank, N.A.*, No. 4:11-CV-359-A, 2012 WL 2511169 (N.D. Tex. June 29, 2012).  Like *Richardson*, Defendants contend that Plaintiffs' waiver argument should be rejected because the Note and SRP demonstrate that Wells Fargo did not intend to waive its right to enforce strictly the terms of the Note and Deed of Trust.  The court agrees.

None of the actions or omissions alleged by Plaintiffs can be construed as an unequivocal manifestation by Wells Fargo of its intent to waive its right to accelerate and foreclose under the Note, Deed of Trust, SRP, and FA.  Instead, the summary judgment evidence establishes the opposite, that is, that Wells Fargo repeatedly asserted its intent to maintain its right to accelerate and foreclose on the Property. The Note, Deed of Trust, SRP, FA, and Wells Fargo's written communications to Plaintiffs providing notice of their default and notice of sale all expressly disclaim any intent by Wells Fargo to waive its right to enforce strictly the terms of the Note, Deed of Trust, SRP, and FA Note.  For example, the Note states:

**Memorandum Opinion and Order – Page 37**

**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

Defs.' App. 7, ¶ 6(D) (emphasis in original).  The Deed of Trust similarly provides:

> **12.   Borrower Not Released; Forbearance By Lender Not a Waiver**. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrowers.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the Original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitations, Lender's acceptance of payments . . . in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

*Id*. 117 (emphasis in original).  Additionally, the FA and SRP make clear that there would be

"**no GRACE PERIOD**" and state:

> 6.   Debtor acknowledges and agrees that the acceleration of the maturity date of the subject Note previously communicated to Debtor remains in full force and effect during the term of this agreement and that *Creditor's forbearance of the Trustee's Sale previously announced to Debtor shall not preclude the reinstitution of such sale or any later sale or collection actions upon Debtor's failure to perform the terms of this agreement*.

> 8.   Debtor acknowledges and agrees that the purpose of this instrument is to set forth the actions required to be taken by Debtor to cure the default previously declared by Creditor for the reinstatement of Debtor's Note and Deed of Trust, and the *Debtor remains bound by all of the duties, obligations and covenants imposed upon Debtor by the Note and Deed of Trust*.

Pls.' App. 19 and 21, ¶¶ 6, 8. (emphasis added).  Wells Fargo's June 9, 2010 letter to Plaintiffs

returning their late payment of $3,335.03 also states, "Please be advised the return of these funds

***shall not constitute a waiver of any remedy*** permitted under the terms of your Mortgage or Deed

of Trust. Your loan is in a Foreclosure status at this time." Defs.' App. 30 (emphasis added). As demonstrated by foregoing evidence, Wells Fargo consistently and repeatedly expressed its intent not to waive any rights it had with regard to acceleration, foreclosure, or any remedy available to it under the Note, Deed of Trust, SRP, and FA.

Further, Plaintiffs' conclusory affidavit testimony regarding the statements allegedly made by Wells Fargo is inadmissible hearsay and does not constitute the type of significant probative evidence required to defeat summary judgment and is contradicted by Plaintiffs' evidence of Wells Fargo's log notes. *Lawrence*, 276 F.3d at 197 (5th Cir. 2001); *see also Duran v. Intex Aviation Serv.*, No. 3:955 CV 0403-R, 1995 WL 1945576, at *2 (N.D. Tex. Nov. 9, 1995) (declining to consider the plaintiff's hearsay statements contained in an affidavit for purposes of establishing the plaintiff's burden of proving the existence of duress), *aff'd*, 98 F.3d 1339 (5th Cir. 1996).

### 6.       Plaintiffs' October 22, 2012 Letter Brief Regarding *Montalvo*

On October 22, 2012, Plaintiffs filed a letter brief in support of their response to the pending summary judgment motion, to which Defendants responded on October 30, 2012. Plaintiffs contend that *Montalvo* is significant and supports their argument regarding their breach of contract claim and promissory estoppel-waiver defense. Plaintiffs focus on the *Montalvo* plaintiff's argument that the defendants breached the note and deed of trust because, after she defaulted, she offered to cure the delinquency while the bank processed her HAMP loan modification application, but the defendants refused her offer to cure and told her that in order to qualify under HAMP and avoid acceleration and foreclosure, it would be best if she remained in default and made instead three monthly payments of $1,091. *See Montalvo*, 2012 WL 1078093, at *1-2, 14-15. The plaintiff contended that she was wrongfully induced into breaching the note and deed of trust and not curing, and defendants were

therefore estopped from accelerating and foreclosing and waived any right in this regard after she defaulted. *Id.*

Because the plaintiff was in default before contacting the bank about modifying her loan, the court rejected any argument that she would not have defaulted but for the bank telling her to make a lower payment than that required by the Note. *Id.* at *15. The *Montalvo* court concluded that estoppel did not apply in this situation because the failure by the plaintiff was not done in reliance on the bank's alleged statements and unenforceable modifying agreement. *Id.* The court did not rule on the plaintiff's argument that the defendants waived their right or were estopped from foreclosing by inducing her to remain in default and not cure by the defendants' representations because the defendants had not moved for summary judgment on this ground and the issue was not adequately briefed. *Id.* at *16.

Plaintiffs in their letter brief summarize the plaintiff's waiver-estoppel argument and the court's discussion of The Restatement (Second) of Contracts § 150, and in particular section 150's language that an unenforceable modification of a contract may operate as a waiver and excuse "the other party from performance of his own duty" if "the waiver is acted on before it is revoked." Ltr. Br. 1-2 (quoting § 150, cmt. b). Plaintiffs, however, do not explain why they believe *Montalvo* or section 150 supports their waiver-estoppel arguments or contract claim. In addition, *Montalvo* was decided March 30, 2012, three months before Plaintiffs filed their summary judgment response on July 20, 2012, and was thus available to Plaintiffs when they filed their response and should have been raised at that time. The court further notes that Plaintiffs did not seek leave to submit the letter brief. Defendants further contend that Plaintiffs have not pleaded or previously raised the section 150 defense, and in any event, "[p]romissory estoppel will only avoid the statute of frauds when the

alleged oral promise is to sign an existing document that satisfies the statute of frauds."  Defs.' Ltr.
Br. 1-2.  Regardless of the timing of the argument, the court determines that the new waiver-estoppel
argument, based on *Montalvo* and section 150, does not help Plaintiffs.

Defendants are correct that the *Montalvo* court observed, "Texas courts do not appear to have
considered, much less adopted, § 150 of the Restatement." *Montalvo*, 2012 WL 1078093, at *15.
Even assuming that the Texas Supreme court might adopt section 150, Plaintiffs' waiver and
estoppel arguments still fail.  Plaintiffs' June 1, 2010 payment was already late under the FA and
SRP when Rhodes contacted  Wells Fargo to notify it that Plaintiffs' payment was going to be a few
days late due to a family emergency.  Thus, like the plaintiff in *Montalvo*, Plaintiffs could not have
defaulted by making the late payment in reliance on any initial statements by Wells Fargo's
representatives that it "would be okay" to make the payment late.  Similarly, Plaintiffs could not
have defaulted in reliance on any subsequent statements by Wells Fargo on June 7, 2010, after
Rhodes had already mailed Plaintiffs' payment, that "everything was ok and that we were not in
foreclosure."  Pls.' App. 3.  Consequently, any estoppel argument by Plaintiffs on this ground is
without merit.

Moreover, the court previously determined that Plaintiffs' evidence regarding the statement
by Wells Fargo that everything was "okay" and that Plaintiffs were not in foreclosure as of June 7,
2010, is not evidence that Wells Fargo promised not to commence acceleration or foreclosure
proceedings as a result of the late payment and default.  Additionally, unlike *Montalvo*, there is no
evidence that Plaintiffs were induced into not curing or remaining in default as a result of
representations by Wells Fargo.  Rather, the undisputed evidence in this case shows that Wells Fargo

refused Plaintiffs' late payment and immediately notified Plaintiffs in writing on June 9, 2010, that

their Property was in foreclosure for failure to pay the full amount of the loan owed as a result of the

default.  Further, there is no evidence that Plaintiffs were capable of curing and attempted to cure

the default or that Wells Fargo refused any attempt by Plaintiffs to cure by offering to pay the full

amount due under the Note.  Accordingly, for these and the reasons previously explained, the court

determines that Plaintiffs have failed to meet their burden of establishing that Wells Fargo  waived

its right to accelerate and foreclose on the Property or that Plaintiffs acted on the alleged waiver

before it was revoked.  Therefore, Plaintiffs cannot use this argument as a means to defeat summary

judgment for Defendants.

> **B.**     **Duty of Good Faith and Fair Dealing**

Plaintiffs allege in their Complaint that Defendants had a duty of good faith and fair dealing

under the Note and violated this duty by accelerating Plaintiffs' payments under the Note.

Defendants contend that they are entitled to summary judgment on this claim because Texas law

does not recognize a general duty of good faith and fair dealing in the mortgage loan context absent

express language in a deed of trust creating such a duty.

Plaintiffs counter that the Texas Supreme Court has never specifically addressed whether a

general duty of good faith and fair dealing exists in the mortgage context.  Plaintiffs further assert

that a note is a negotiable instrument under section 1.203 of the Uniform Commercial Code ("UCC")

and that the UCC carries with it a duty of good faith even though the Texas Supreme Court noted

in *FDIC v. Coleman* that "[i]t is not at all clear that a guarantee agreement contained in a separate

document, guaranteeing payment of a promissory note secured by a lien on real property, is a

contract within the UCC to which section 1.203 applies." 795 S.W.2d 706, 708 (Tex. 1990). To support their argument that a duty of good faith and fair dealing exists in the mortgage context, Plaintiffs cite *Belyea v. Litton Loan Servicing, LLP*, No. 10-10931-DJC, 2011 WL 2884964 (D. Mass. July 15, 2011). Although the court in *Coleman* held that there is no general duty of good faith and fair dealing in the mortgage context, Plaintiffs contend that *Coleman* stands only for the limited proposition that no duty of good faith and fair dealing exists in the mortgage context when a plaintiff's claim is based on the contention that the FDIC was not diligent in foreclosing on the plaintiff's property. Pls.' Resp. 25. Defendants reply that the same argument by Plaintiffs' counsel was rejected by the court in *Richardson v. Wells Fargo Bank, N.A.,* 2012 WL 2511169 at *9.[9]

Having reviewed the Note, the court concludes that it contains no express covenant of good faith and fair dealing. The court therefore addresses whether Defendants had an implied duty of good faith and fair dealing. The Texas Supreme Court has declined to read an implied duty of good faith and fair dealing into every contract. *English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983). Such a duty arises only as a result of a "special relationship" between parties governed or created by a contract. *Arnold* v. *National Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987); *Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex. 1984). The "special relationship" cause of action for breach of the duty of good faith and fair dealing "does not extend to ordinary commercial contractual

---

[9] In response to the plaintiff's argument in *Richardson* that her note was a negotiable instrument governed by chapters one and three of the UCC, the court concluded that "contrary to plaintiff's assertions . . . [b]ecause the Deed of Trust places a lien on real property, it is not governed by the UCC." *Id.* (quoting *Vogel v. Travelers Indem. Co.*, 966 S.W.2d 748, 753 (Tex. App.—San Antonio 1998, no pet.) (emphasis in original). The *Richardson* court further noted that "The comments to section three of the UCC also could not be more clear: 'Article 3 is not meant to apply to contracts for . . . the sale or lease of real property or similar writings that may contain a promise to pay money.'" *Id.* (citing Tex. Bus. & Comm. Code § 3.104, cmt. 2).

relationships." *Central Sav. & Loan Ass'n v. Stemmons N.W. Bank, N.A.*, 848 S.W.2d 232, 239 (Tex. App.   Dallas 1992, no writ).   As a result, Texas courts have held that the "special relationship" necessary to create a common law duty to act in good faith does not apply to relationships of supplier and distributor, mortgagor and mortgagee, creditor and guarantor, lender and borrower, franchisor and franchisee, issuer and beneficiary letter of credit, or employer and employee.   *Cole v. Hall*, 864 S.W.2d 563, 568 (Tex. App.   Dallas 1993, writ dism'd w.o.j.); *but see Davis v. West*, 317 S.W.3d 301, 312 (Tex. App.   Houston [1st Dist.] 2009, no pet.) (noting that a bank-customer relationship does not normally give rise to a special relationship; however, when a special relationship between borrower and lender has been found, it is because the lender engaged in conduct such as exercising "excessive lender control over, or influence in, the borrower's business activities").

The implied duty of good faith and fair dealing has been applied only in limited circumstances such as long-standing relations, relationships when there is an imbalance of bargaining power, and relationships involving significant trust and confidence shared by the parties. *Caton v. Leach Corp.*, 896 F.2d 939, 948 (5th Cir. 1990) (citing *Aranda v. Insurance Co.*, 748 S.W.2d 210, 212-13 (Tex. 1988)).   Plaintiffs do not argue that a "special relationship" or a "relationship of trust and confidence" exists between them and Defendants, and the court concludes that none exists.   Additionally, there is no evidence or allegation that Wells Fargo exerted excessive lender control over, or influence in, Plaintiffs' business activities as borrowers.   *See Davis*, 317 S.W.3d at 312.   The court therefore determines that, under Texas common law, Plaintiffs' Note and status as borrowers do not give rise to a duty of good faith and fair dealing.   Because the court's holding in *Belyea* relied on by Plaintiffs was based on Massachusetts state common law, which

unlike Texas law implies a duty of good faith and fair dealing in every contract, it is not binding precedent or relevant to the court's analysis. *See Belyea*, 2011 WL 2884964, at *9; *Coleman*, 795 S.W.2d at 708-709 (concluding that a common-law duty of good faith and fair dealing "is not imposed in every contract but only in special relationships marked by shared trust or an imbalance in bargaining power" and the relationship between a mortgagor and mortgagee does not ordinarily involve a duty of good faith).

Furthermore, even assuming that the Note qualifies as a negotiable instrument under the UCC, Plaintiffs have presented no competent summary judgment evidence to support their assertion that Wells Fargo breached the duty of good faith and fair dealing allegedly owed to Plaintiffs by accelerating the Note. Plaintiffs admittedly failed to make timely their June 2010 payment in accordance with the FA and SRP. Wells Fargo was therefore entitled under the Note, Deed of Trust, and SRP to accelerate and foreclose on the Property upon Plaintiffs' default. Moreover, there is no evidence that Plaintiffs attempted or were capable of paying Wells Fargo all sums due under the Note to cure the default. *See* Defs.' App. 119, ¶ 19 (Borrower's Right to Reinstate After Acceleration). The court therefore concludes that Plaintiffs have failed to raise a genuine dispute of material fact to survive summary judgment regarding their good faith and fair dealing claim and Defendants are entitled to judgment as a matter of law on this claim.

## C.     Unreasonable Collection Efforts under Texas Common Law

Plaintiffs allege in their Complaint that Defendants violated Texas common law by engaging in unreasonable collection efforts. Plaintiffs contend that they complied with all of Defendants' requests but Defendants failed to give them a chance to reinstate or cure the default, and intentionally

misled and delayed Plaintiffs to the point of foreclosure while assessing late charges and penalties. Pls.' Compl. 10, ¶ 28.  Plaintiffs argue that Defendants' wrongful foreclosure and assessment of numerous additional charges on Plaintiffs' mortgage account was a deceptive means of collecting on a debt.  *Id.*  In response to Defendants' motion, Plaintiffs contend that the following evidence supports their unreasonable collection claim:

- Plaintiffs were told they were approved for a loan modification, but Wells Fargo never modified their loan.

- Plaintiffs were told not to make a payment while their loan modification application was being processed, because it would be rejected.

- Wells Fargo told Plaintiffs that it would not foreclose while Plaintiffs were in the loan modification process, but while Plaintiffs were in the loan modification process, Wells Fargo foreclosed.

- Wells Fargo told Plaintiffs that [they] had to pay $8,000 down payment and that their first installment would be due in February 2010.  As instructed, on December 26, 2009, Plaintiffs paid Wells Fargo $8,000 via western union, but Wells Fargo eventually rejected the payment.

- Plaintiffs were again told that their loan modification was approved that that [sic] they needed to pay $8,000 down and that their first installment of $3,335.05 would be due in April.  As instructed, Plaintiffs again paid Wells Fargo $8,000 as down payment on February 26, 2010.  Plaintiff[s] then began paying their monthly installment pursuant to the agreement.

- Plaintiffs called Wells Fargo on June 7, 2010 and were told everything was ok and that they were not in foreclosure.

- Wells Fargo told Plaintiffs that they could make their June 2010 payment a few days late.  When Plaintiffs sent Wells Fargo their June payment less than 10 days late, Wells Fargo sent it back stating that it was not for the total amount due.

- Wells Fargo told that [sic] Plaintiffs that they would need to reapply for the loan modification.

- • Plaintiff provided additional documents to Wells Fargo on June 30, 2010, July 29, 2010 and again on August 2, 2010.  However, on August 3, 2010, Wells Fargo foreclosed upon Plaintiffs' property.

Pls.' Resp. 27-28.

Defendants contend that Plaintiffs have not cited authority that such actions constitute unreasonable collection efforts under Texas common law.  The parties disagree regarding the standard applicable to unreasonable collection efforts claims.  Defendants maintain, based on *EMC Mortgage Corporation v. Jones*, 252 S.W.3d 857 (Tex. App.   Dallas, 2008, no pet.), that unreasonable collection efforts "amount to a course of harassment that was willful, wanton, malicious, and intended to inflict mental anguish and bodily harm."  *Id.* at 868.  Plaintiffs, on the other hand, advocate the less rigorous standard enunciated in *Employee Finance Company v. Lathram*, 363 S.W.2d 899 (Tex. Civ. App.   Fort Worth 1962), *rev'd in part on other grounds*, 369 S.W.2d 927 (Tex. 1963), which defined unreasonable collection efforts as "efforts which an ordinary person of ordinary prudence in the exercise of ordinary care on his or her part would not have exercised under the same or similar circumstances."  *Id.* at 901.

As correctly noted by Defendants, the Fifth Circuit in *De Francheschi v. BAC Home Loans Servicing, L.P.*, No. 11   10860, 2012 WL 1758597 (5th Cir. May 17, 2012) (unpublished), affirmed summary judgment for the defendant on the plaintiffs' claim of unreasonable collection efforts when the district court applied the standard found in *EMC Mortgage Corporation*, concluding that "the district court did not err in adopting the standard set forth in *EMC Mortgage Corp* [*v. Jones*]. . . . instead of the standard in . . . *Lathram*, . . . which has largely been disavowed by Texas courts."  *Id.* at *3 (citing *Watson v. Citimortgage, Inc.*, 814 F. Supp. 2d 726, 734 (E.D. Tex. 2011)).  The court

therefore applies the standard set forth in *Jones* and concludes that the conduct alleged by Plaintiffs does not, as a matter of law, rise to a level of "efforts that amount to a course of harassment that was willful, wanton, malicious, and intended to inflict mental anguish and bodily harm." *EMC Mortgage Corp.*, 252 S.W.3d at 868.

Courts considering the same issue have concluded that the same or similar conduct as that alleged by Plaintiffs is not sufficient to sustain a claim for unreasonable collection efforts, particularly when the plaintiff owes money to the lender. *See, e.g.*, *Narvaez v. Wilshire Credit Corp.*, 757 F. Supp. 2d 621, 636 (N.D. Tex. 2010) ("Plaintiff also points to Defendants' refusal to provide Plaintiff with the opportunity to cure his default or contest the amount owed. Plaintiff has not provided any authority, and the Court is aware of none, supporting the proposition that the failure to provide information is a collection effort."); *Richardson,* 2012 WL 2511169, at *10-11 (concluding that defendant's alleged failure to give the plaintiff a chance to reinstate or cure the default; intentionally misleading and delaying the plaintiff to the point of foreclosure; assessing late charges, penalties, and other additional charges; and improperly placing the property in foreclosure did not constitute unreasonable collection efforts); *Sanghera v. Wells Fargo Bank, N.A.*, No. 3:10-CV-2414-B, 2012 WL 555155, at *7 (N.D. Tex. Feb. 21, 2012) (rejecting plaintiffs' unreasonable collection effort claim based on lender's alleged failure to provide information regarding the right to cure or potential loan modification, promising not to foreclose, and foreclosing after accepting payments under the loan modification trial plan and concluding that "[T]he Court is unaware of and Plaintiffs have provided no authority as to how promising not to foreclose on a property, can, without more, be considered willful, wanton, or malicious harassment."); *Steele v. Green Tree*

*Serv., LLC*, No. 3:09-CV-0603-D, 2010 WL 3565415, at *6 (N.D. Tex. Sept. 7, 2010) ("making or breaking an express promise is [not] itself willful, wanton, and malicious" and "[t]here is no indication that Defendants intended to inflict bodily harm by sending letters to the Plaintiff."); *Mitchell v. Chase Home Fin. LLC*, No. 3:06-CV-2099-K, 2008 WL 623395, at *6 (N.D. Tex. Mar. 4, 2008) (holding that defendant's collection efforts in seeking sums owed were not unreasonable because plaintiffs were in default on their loan and evidence demonstrated that the defendant provided plaintiffs with "several acceleration warning letters, advised them to seek emergency homeowner counseling, and worked with them to provide loss mitigation options such as the Partial Claim and the Repayment Plan.").

The same result is warranted here. The summary judgment evidence establishes that Plaintiffs defaulted not once but twice, and there is no evidence that they attempted or were capable of curing by paying all sums due under the Note.  When "a debt is owed to the lender, a claim for unreasonable debt collection efforts cannot survive when the lender simply tries to recover the debt."  *Sanghera*, 2012 WL 555155, at *7; *Defranceschi*, 2011 WL 3875338, at *6.  The record further shows that after Plaintiffs defaulted the first time and fell behind on their payments, Wells Fargo sent Plaintiffs several acceleration warning letters and worked with them to provide repayment options under the FA and SRP.  After Plaintiffs defaulted a second time by failing to timely make their June 2010 payment under the SRP, Wells Fargo, though it was under no obligation to do so, again considered at Plaintiffs' request whether they qualified for a loan modification or other workout options but ultimately determined they did not.   Thus, Wells Fargo merely exercised its rights and remedies under the Note, Deed of Trust, and SRP when it accelerated and foreclosed on the Property.  Additionally, requesting and providing Plaintiffs with information regarding the status of their loan

modification process does not qualify as debt collection efforts. At most, such conduct constitutes mere negligence, which is not actionable under an unreasonable collection efforts claim. *See Sanghera*, 2012 WL 555155, at *7; *see also EMC Mortg. Corp.*, 252 S.W.3d at 868 ("[u]nreasonable collection is an intentional tort.").

Plaintiffs' reliance on *Overholt v. Wells Fargo Bank, N.A.*, No. 4:10 CV 618, 2011 WL 4862525 (E.D. Tex. Sept. 2, 2011), to support their contention that Defendants' conduct constitutes unreasonable collection efforts is similarly misplaced, as that case was before the court on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure and was only at the pleading stage. Moreover, the *Overholt* court noted that its decision not to grant the motion to dismiss the plaintiff's unreasonable collection efforts claim was a "close call," and further indicated that the defendant "should be able to develop the facts in a motion for summary judgment." *Id.* at *7; *see also Richardson,* 2012 WL 2511169, at *10 (rejecting the same argument by the plaintiff based on the same reasoning).

In sum, Plaintiffs have failed to provide any evidence that would permit a reasonable trier of fact to find that Wells Fargo's conduct in accelerating and foreclosing and Freddie Mac's conduct in purchasing the Property in foreclosure were unreasonable under *EMC Mortgage Corporation*. Plaintiffs' evidence also fails to establish that Defendants intended to inflict bodily harm through their alleged conduct. Accordingly, Plaintiffs have failed to raise a genuine dispute of material fact regarding their unreasonable debt collection claim, and Defendants are entitled to judgment as a matter of law on this claim.

### D.     Fraud and Negligent Misrepresentation - Economic Loss Doctrine

Defendants contend that Plaintiffs' fraud and negligent representation claims are barred by the economic loss doctrine.  Defendants also argue that they are entitled to summary judgment on Plaintiffs' negligent representation claim because it concerns alleged promises of future conduct. Because the court determines that the economic loss doctrine is dispositive of Plaintiffs' fraud and negligent representation claims, it addresses first this issue.

Under Texas law, when "the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986).  Thus, tort damages are generally not recoverable if the defendants' conduct "would give rise to liability only because it breaches the parties' agreement." *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991).  Tort damages are recoverable, however, if the defendants' conduct "would give rise to liability independent of the fact that a contract exists between the parties." *Id.*  In other words, the defendant must breach a duty imposed by law rather than by contract.  *Id.*

Plaintiffs argue that their fraud and negligent representation claims are not barred by the economic loss rule because the tort damages they seek are in addition to those for alleged contractual losses or damages to the subject matter of the Note and Deed of Trust.  Specifically, Plaintiffs assert that they have presented evidence of damages in addition to typical economic harm that they have suffered as a result of Wells Fargo's fraud and negligent misrepresentations, including damages for Plaintiffs' loss of valuable time spent in speaking with Defendants' representatives and attorneys, and calling, writing, and gathering and sending requested documentation.  Rhodes estimates that, prior to filing suit, he spent approximately 150 hours attempting to resolve the situation and has thus far

paid over $20,000 in attorney's fees.  Rhodes further states in his affidavit that Plaintiffs' credit rating has been lowered, and Rhodes has "suffered substantial stress, loss of sleep . . . daily and nightly anxiety . . . humiliation and embarrassment due to the foreclosure."  Pls.' Resp. 31.

Defendants counter that Plaintiffs' argument that the type of damages alleged are independent has been rejected by other courts, and Plaintiffs have failed to cite any authority to take their tort claims outside the reach of the economic loss doctrine.  For support that Plaintiffs' alleged tort damages are barred by the economic loss doctrine, Defendants cite *Wiley v. U.S. Bank, N.A.*, No. 3:11-CV-1241-B, 2012 WL 1945614, at *12 (N.D. Tex. May 30, 2012) ("Plaintiff attempts to circumvent the economic loss doctrine by alleging a variety of damages unrelated to the Note and Deed of Trust including attorneys' fees, lost time, emotional distress, and a lower credit rating. Such allegations are not sufficient to avoid the economic loss doctrine in this case.").  Defendants argue that, like *Wiley*, Plaintiffs' tort claims and alleged damages "flow solely from the obligations created by the Note and Deed of Trust and would not exist but for the contractual relationship between the parties."  Defs.'s Reply 16 (quoting *Wiley*, 2012 WL 1945614, at *12).  Defendants also cite and quote *Sanghera*, 2012 WL 555155, at *6, which concluded that "Plaintiffs' alleged loss of title and creditworthiness are economic damages that arise directly from the alleged breach of this contractual relationship; thus, Plaintiffs' tort cause of action is barred by the economic loss rule.").

The court agrees that Plaintiffs' alleged economic loss arises solely from their contractual relationship with Wells Fargo under the Note, Deed of Trust, FA, and SRP.  *See Wiley*, 2012 WL 1945614, at *12; *Sanghera*, 2012 WL 555155, at *6; *see also Williams v. Federal Nat'l Mortg. Ass'n*, No. 2:11-CV-157-J, 2012 WL 443986, at *4 (N.D. Tex. Feb 13, 2012) (Plaintiffs' negligence claims arise out of alleged breaches of the loan modification. They allege that Defendants negligently

**Memorandum Opinion and Order – Page 52**

performed their side of the agreement, negligently misrepresented the terms of the loan modification, and misrepresented to the Plaintiffs that they would not foreclose on the property. Plaintiffs' negligence claims are barred because they allege Defendants were negligent in their performance of the loan agreement, but, under Texas law, "the failure to perform the terms of a contract is a breach of contract, not a tort.") (quoting *Jim Walter Homes, Inc.*, 711 S.W.2d at 618). Accordingly, Plaintiffs' fraud and negligent representation claims are barred by the economic loss doctrine. Plaintiffs have therefore failed to raise a genuine dispute of material fact regarding their fraud and negligent representation claims, and Defendants are entitled to judgment as a matter of law on these claims.

### E. TDCPA Claim

The TDCPA permits a consumer to sue for threats, coercion, harassment, abuse, unconscionable collection methods, or misrepresentations made in connection with the collection of a debt. Tex. Fin. Code Ann. § 392.001, *et seq*. (West 2006). The TDCPA defines "debt collection" as "an action, conduct, or practice in collecting, or in soliciting for collection, consumer debts that are due or alleged to be due a creditor." § 392.001(5). It has been held to apply to foreclosures on real property. *See Biggers v. BAC Home Loans Serv., LP*, 767 F. Supp. 2d 725, 731 (N.D. Tex. 2011). Plaintiff has asserted TDCPA claims under sections 392.301(a)(8), 392.302(4), 392.303(a)(2), 392.304(a)(8), and 392.304(a)(19) of the Texas Finance Code.

### 1. Section 392.301(a)(8)

Defendants argue that Plaintiffs have failed to allege or demonstrate that Wells Fargo used threats or coercion. Plaintiffs respond that Wells Fargo violated section 382.301(a)(8) by unlawfully foreclosing on their Property because: (1) Wells Fargo was not entitled to accelerate and foreclose

under the Note and Deed of Trust because its rights in this regard had not matured; (2) the assignment

from MERS to Wells Fargo is invalid; and (3) the FA precludes Wells Fargo from foreclosing.

Section 392.301(a)(8) prohibits debt collectors from taking a variety of actions, including

"threatening to take an action prohibited by law." § 392.301(a)(8).  The court has already concluded

that the assignment was valid and Wells Fargo was entitled to accelerate and foreclose under the

Note, Deed of Trust, FA, and SRP after Plaintiffs defaulted a second time in June 2010.  Accordingly,

Plaintiffs have failed to raise a genuine dispute of material fact as to their section 392.301(a)(8)

TDCPA claim, and Defendants are entitled to judgment as a matter of law as to this claim.

## 2.      Section 392.302(4)

Defendants maintain that Plaintiffs' Complaint contains no allegations that Wells Fargo

repeatedly or continuously telephoned Plaintiffs with the intent to harass in violation of section

392.302(4).  Plaintiffs provided no response in support of their section 392.302(4) claim.[10]

Section 392.302(4) states: "In debt collection, a debt collector may not oppress, harass, or

abuse a person by . . . causing a telephone to ring repeatedly or continuously, or making repeated or

continuous telephone calls, with the intent to harass a person at the called number." § 392.302(4).

After reviewing Plaintiffs' Complaint, which is not verified, and Plaintiffs' summary judgment

evidence, the court concludes that Plaintiffs have failed to raise a genuine dispute of material fact as

to their section  392.302(4) TDCPA claim.  It is unclear from Plaintiffs' pleadings or evidence what

---

[10] This failure, of course, does not permit the court to enter a "default" summary judgment. *Eversley v. Mbank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988).  A court, however, is permitted to accept the movant's facts as undisputed when no response or opposition is filed. *Id.*  Normally, "[a] summary judgment nonmovant who does not respond to the motion is relegated to [their] unsworn pleadings, which do not constitute summary judgment evidence."  *Bookman v. Schubzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996) (citing *Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 165 (5th Cir. 1991)).  In this case, there is testimony presented by way of affidavit and other evidence that the court must consider because it is part of the record.

conduct by Defendants allegedly violated section 392.302(4), and as Defendants note, there is no allegation or evidence by Plaintiffs that Wells Fargo repeatedly or continuously telephoned Plaintiffs with the intent to harass in violation of section 392.302(4).  Plaintiffs have therefore failed to raise a genuine dispute of material fact as to their section 392.302(4) TDCPA claim, and Defendants are entitled to judgment as a matter of law on this claim.

### 3.      Section 392.303(a)(2)

Section 392.303(a)(2) prohibits debt collectors from using "unfair or unconscionable means" in "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer." § 392.303(a)(2).  "Notwithstanding Subsection (a)(2), a creditor may charge a reasonable reinstatement fee as consideration for renewal of a real property loan or contract of sale, after default, if the additional fee is included in a written contract executed at the time of renewal."  § 392.303(b).  Neither section 392.303 nor the TDCPA defines "unfair or unconscionable means," although sections 392.301, 392.302, and 392.304 list prohibited practices referred to as threats or coercion, harassment or abuse, and fraudulent, deceptive, or misleading representations.

Defendants contend that the Note and Deed of Trust both expressly provide for the assessment of fees and late charges.  Plaintiffs argue in response that:

> Wells Fargo did not produce a transaction history in response to Plaintiffs' written discovery, and therefore Plaintiffs dispute how their payments were applied and the additional charges on Plaintiffs' account since it was Wells Fargo who returned Plaintiffs' June 2010 payment. Plaintiffs complied with the agreement and it was Wells Fargo . . . who breached the agreement by returning the payment and foreclosing upon the property.

Pls.' Resp. 35.  Plaintiffs provide no legal authority, and the court is aware of none, to support their position that the failure of a defendant in litigation to produce a transaction history of payments and charges constitutes a violation of section 392.303(a)(2) of the TDCPA.  Moreover, the court has already determined that Plaintiffs breached and defaulted under the FA and SRP when they failed to make timely their June 2010 payment.  Thus, contrary to Plaintiffs' assertion, the evidence establishes that Plaintiffs did not comply with the agreement, and Wells Fargo's return of Plaintiffs' late payment did not constitute a breach.  Further, Plaintiffs have directed the court to no summary judgment evidence to support their contention regarding the allegedly unlawful application of payments and assessment of fees after Plaintiffs defaulted.  Accordingly, Plaintiffs have failed to raise a genuine dispute of material fact as to their section  392.303(a)(2) TDCPA claim, and Defendants are entitled to judgment as a matter of law on this claim.

### 4.      Sections 392.304(a)(8) and 392.304(a)(19)

Section 392.304 generally prohibits a debt collector from using "fraudulent, deceptive, or misleading representation[s]" in collecting on debts and obtaining information concerning a consumer.  § 392.304.  Section 392.304(a)(8) prohibits a debt collector from "misrepresenting the character, extent, or amount of a consumer debt, or misrepresenting the consumer debt's status in a judicial or governmental proceeding."  § 392.304(a)(8).  Section 392.304(a)(19) operates as a "catch-all" provision and prohibits a debt collector from "using any other false representation or deceptive means to collect a debt or obtain information concerning a consumer."  § 392.304(a)(19).

Wells Fargo contends that Plaintiffs fail to make any specific allegations in support of their TDCPA claim under these sections and that other courts have held that "oral statements promising not to foreclose and promising to provide a permanent loan modification" do not constitute TDCPA

violations. Defs.' Mot. 22 (quoting *Wiley*, 2012 WL 1945614, at *11) and citing *Kazmi v. BAC Home Loans Serv., L.P.*, No. 4:11-CV-375, 2012 WL 629440 (E.D. Tex. Feb. 3, 2012), *report and recommendation adopted by* 2012 WL 629433 (E.D. Tex. Feb. 27, 2012), for the proposition that Plaintiffs' TDCPA claim fails because "Defendants were free to pursue foreclosure after Plaintiffs defaulted."

Plaintiffs counter that Wells Fargo used false representations and deceptive means to collect on the debt through foreclosure. Specifically, Plaintiffs take issue with the loan modification process and inconsistent information they contend was provided by Wells Fargo as to whether their application had been approved or denied. Plaintiffs further contend that, as instructed, they paid $8,000 towards their first installment and began making monthly payments pursuant to the agreement in April 2010. Plaintiffs also contend that Wells Fargo informed them it would be okay to make their June 2010 payment late but Wells Fargo subsequently returned and refused to accept their late payment. Plaintiffs argue that, as instructed by Wells Fargo, they reapplied and provided additional information in support of their loan modification in August 2010 but Defendants foreclosed on the Property "after entering into an agreement and while Plaintiffs were in the loan modification process." Pls.' Resp. 37. Finally, Plaintiffs contend that Wells Fargo misrepresented the extent of the debt when it failed to allow them to pay the arrearage as authorized by the Deed of Trust, and instead demanded the entire amount due under the Note.

The court has determined previously that Wells Fargo was entitled to accelerate and foreclose under the parties' various agreements after Plaintiffs failed to make timely their June 2010 payment as required by the FA and SRP in June 2010. Plaintiffs' argument that Wells Fargo was required but did not permit them to pay arrearages is therefore without merit, and Plaintiffs have presented no

**Memorandum Opinion and Order – Page 57**

evidence that they requested and Wells Fargo refused to provide them with the balance due under the Note. The court further concludes that Plaintiffs' verbal discussions and submissions of information regarding Plaintiffs' requested "loan modification" do not constitute representations or misrepresentations as to the amount or character of the debt. *See Watson v. Citimortgage, Inc.*, No. 4:10-CV-707, 2012 WL 381205, at *7-8 (E.D. Tex. Feb. 3, 2012) ("Discussions regarding loan modification or a trial payment plan are not representations, or misrepresentations, of the amount or character of the debt . . . Plaintiffs have pointed to no evidence that would permit a reasonable trier of fact to find that Defendant's discussions regarding loan modifications and Defendant's delaying foreclosure while attempting to work out a trial payment plan constitute 'deceptive means' to collect a debt.").

Other than the conclusory, self-serving, hearsay affidavit testimony of Rhodes, Plaintiffs have presented and point to no evidence to support their contention that Wells Fargo approved their second requested loan modification and represented that Plaintiffs were not required to make timely their June 2010 payment under the FA and SRP.[11]  *See United States v. Lawrence*, 276 F.3d at 197. Rhodes's testimony in this regard is insufficient to counter and create a genuine dispute of material fact in light of Plaintiffs' admission and Wells Fargo's evidence that Plaintiffs were notified by Wells Fargo via a letter dated June 9, 2010, that their late payment had been rejected and their loan was in foreclosure. An August 5, 2010 letter from Rhodes to Defendants similarly demonstrates that after

---

[11] To raise a genuine dispute of material fact in this regard, Plaintiffs , for example, could have submitted a copy of Wells Fargo's call log to support their contention that Wells Fargo made certain verbal representations to Plaintiffs in violation of the TDCPA. *See, e.g., Sanghera*, 2012 WL 555155, at *9 (concluding that Wells Fargo's call log in conjunction with the Sanghera's affidavit was sufficient to raise a genuine dispute of material fact regarding their section 392.304(a)(8) and 392.304(a)(19) TDCPA claims based on the plaintiffs' contention that Wells Fargo misled Plaintiffs by informing them that they were approved for a loan modification). Here, although Plaintiffs submitted certain of Wells Fargo's log notes, the log notes do not support Rhodes's affidavit testimony.

Wells Fargo returned Plaintiffs' late payment, they telephoned Wells Fargo and were told that it was late and "sorry, no exception for any reason."  Pls.' App. 31.

Plaintiffs also concede that, as of August 2, 2010, after they defaulted a second time and were required by Wells Fargo to reapply for a "loan modification," they were still in the "loan modification" application process (Pls.' App. 31) and thus could not have been reapproved.  They present no summary judgment evidence to support their assertion that they entered a loan modification agreement or another unspecified agreement that would permit them to act in contravention to the Note, Deed of Trust, FA, and SRP that required timely payments and permitted Wells Fargo to accelerate and foreclose upon Plaintiffs' June 2010 late payment and default.  Finally, Plaintiffs' contention regarding the $8,000 down payment and monthly payments beginning in February 2010 is irrelevant because, as previously explained, Wells Fargo did not foreclose until *after* Plaintiffs defaulted the second time in June 2010.  The court therefore determines that Plaintiffs have failed to raise a genuine dispute of material fact regarding their section 392.304(a)(8) and 392.304(a)(19) TDCPA claims, and Defendants are entitled to judgment as a matter of law on these claims.

### F.    DTPA Claim

Defendants contend that regardless of whether Plaintiffs assert a DTPA claim through a tie-in statute such as the TDCPA, they must still be consumers under the DTPA.  Defendants assert that because Plaintiffs' DTPA claim arises out of a loan and does not involve the purchase or lease of goods or services, they do not qualify as consumers.  Defendants further contend that Plaintiffs have not provided any competent summary judgment evidence to satisfy the other elements of their DTPA claim.  Defendants contend, for example, that Plaintiff cannot establish that Defendants engaged in

false, misleading, or deceptive acts or that any such alleged acts were the producing cause of their damages. Plaintiffs acknowledge that they have not alleged an independent claim under the DTPA claim but instead have alleged only claims under the TDCPA. Plaintiffs, however, dispute whether they are required to establish their status as consumers to maintain a TDCPA claim. Because the court has already ruled as to Plaintiffs' TDCPA claim and Plaintiffs concede that they had no intention of asserting a DTPA claim, the court **denies as moot** Defendants' motion as to Plaintiffs' DTPA. *See supra* note 1.

### G.      Quiet Title and Trespass to Try Title Claims

Trespass to try title suits are governed by Chapter 22 of the Texas Property Code and "is the method of determining title to lands, tenement, or other real property." Tex. Prop. Code Ann. § 22.001(a); *Martin v. Amerman*, 133 S.W.3d 262, 265 (Tex. 2004). In such a suit, the plaintiff "must recover on the strength of his own title" and cannot rely on the weaknesses of the defendant's title. *Id.* To prevail, the plaintiff usually must: "(1) prove a regular chain of conveyances from the sovereign, (2) establish superior title out of a common source, (3) prove title by limitations, or (4) prove title by prior possession coupled with proof that possession was not abandoned." On the other hand, a suit to quiet title "is an equitable action that involves *clearing* a title of an invalid charge against the title." *Longoria v. Lasater*, 292 S.W.3d 156, 165 n.7 (Tex. App.   San Antonio 2009, pet denied) (quoting *A.I.C. Mgt. v. Crews*, No. 01  03  01178  CV, 2005 WL 267667, at *3 n.8 (Tex. App.   Houston [1st Dist.] Feb. 3, 2005), *rev'd on other grounds*, 246 S.W.3d 640 (Tex. 2008)) (emphasis in original). The elements of a cause of action to quiet title are: (1) an interest in a specific property; (2) title to the property is affected by a claim by the defendant; and (3) a claim, although facially valid, is invalid or unenforceable. *Sadler v. Duvall*, 815 S.W.2d 285, 293 n.2 (Tex.

App.   Texarkana 1991, writ denied).  The plaintiff has the burden of establishing his "superior equity

and right to relief," and like a suit for trespass to try title, the plaintiff must rely on the strength of his

or her own title, not the weaknesses of the defendant's title.  *See Hahn v. Love*, 321 S.W.3d 517, 532

(Tex. App.   Houston [1st Dist.] 2009, pet denied).   In other words, the plaintiff must prove his

"right, title, or ownership in himself with sufficient certainty to enable the court to see that he has a

right of ownership and that the alleged adverse claim is a cloud on the title that equity will remove."

*Id.*

Plaintiffs' quiet title and trespass to try title claims are based on their contention that the

assignment from MERS to Wells Fargo is invalid and the sale to Freddie Mac is void.  Having already

addressed and rejected Plaintiffs' contentions in this regard, the court determines that Plaintiffs have

failed to raise a genuine dispute of material fact regarding their superior title or the alleged invalidity

of Wells Fargo's title, and Defendants are entitled to judgment as a matter of law as to this claim.

### H.   Request for Accounting and Declaratory Judgment

The federal declaratory judgment act ("FDJA") is a procedural device that creates no

substantive rights. *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-41 (1937).  Consequently,

the FDJA provides no relief unless there is a justiciable controversy between the parties.  *See id.*  A

plaintiff seeking injunctive or declaratory relief must allege a "substantial and continuing"

controversy:

> In order to demonstrate that a case or controversy exists to meet the Article III
> standing requirement when a plaintiff is seeking injunctive or declaratory relief, a
> plaintiff must allege facts from which it appears there is a substantial likelihood that he
> will suffer injury in the future. Based on the facts alleged, there must be a substantial
> and continuing controversy between two adverse parties. The plaintiff must allege facts
> from which the continuation of the dispute may be reasonably inferred. Additionally,
> the continuing controversy may not be conjectural, hypothetical, or contingent; it must

be real and immediate, and create a definite, rather than speculative, threat of future injury.

> Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects. To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future. Similar reasoning has been applied to suits for declaratory judgment.

*Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003) (citations and quotations omitted). Thus, "a declaratory judgment is merely a form of relief that a court may grant based on an underlying claim." *DeFranceschi*, 837 F. Supp. 2d at 626 (citing *Collin Cnty., Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods (HAVEN)*, 915 F.2d 167, 171 (5th Cir. 1990)). As explained and determined herein, there is no genuine dispute of material fact regarding any of Plaintiffs' claims. As a result, there is no underlying claim for the court to adjudicate. *See Val Com Acquisitions Trust v. CitiMortgage, Inc.*, 421 F. App'x 398, 400-01 (5th Cir. 2011) (per curiam). Plaintiffs' request for an accounting is likewise equitable in nature and does not constitute an independent cause of action. Moreover, the request for an accounting is mooted by the court's rulings as to Plaintiffs' claims. *DeFranceschi*, 837 F. Supp. 2d at 627. Accordingly, Plaintiffs' request for declaratory judgment relief and an accounting is **denied as moot**,[12] and Defendants are entitled to judgment as a matter of law on this claim.

## IV.    Conclusion

For the reasons herein stated, the court determines that no genuine dispute of material fact exists as to any of Plaintiffs' claims. Accordingly**,** the court **grants** Defendants Wells Fargo Bank,

---

[12] For the same reason, Defendants' request for declaratory relief on the same grounds is mooted by the court's ruling as to Plaintiffs' claims.

N.A. and Federal Home Loan Mortgage Corporation's Motion for Summary Judgment, and **dismisses**

this action **with prejudice**.  The court, as required by Rule 58 of the Federal Rules of Civil Procedure,

will issue judgment by separate document.

      **It is so ordered** this 31st day of October, 2012.


                                              Sam A. Lindsay
                                            United States District Judge